UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
SEVERSTAL WHEELING INC., et al.,                    :

                Plaintiffs,                    : 10 Civ. 954 (GWG)

   -v.-                                                  : OPINION AND ORDER

WPN CORPORATION, et al.,                            :

                Defendants.                    :

----------------------------------------------------------------X
**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

Plaintiffs Severstal Wheeling, Inc. Retirement Committee (the "SRC"), Timothy S.

Rogers, Melvin Baggett, William Drew Landon, and Severstal Wheeling, Inc ("SWI"), bring this

suit pursuant to the Employment Retirement and Income Security Act ("ERISA"), 29 U.S.C.

§§ 1001-1169, and state law against WPN Corporation ("WPN"), Ronald LaBow, and WHX

Corporation ("WHX") (collectively "the defendants").  LaBow, who is the principal of WPN,

has been sued both in his individual capacity and as a named fiduciary of the Wheeling

Corrugating Company Retirement Security Plan of Severstal Wheeling, Inc. (the "Wheeling

Corrugating Plan").  The three defendants have filed motions to dismiss pursuant to Federal Rule

of Civil Procedure 12(b)(6).  The parties have consented to the adjudication of these motions by

a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  For the following reasons,

WHX's motion to dismiss is granted, and WPN's and LaBow's motion to dismiss are granted in

part and denied in part.

I.      BACKGROUND

        A.      Facts

        The facts alleged in the plaintiffs' complaint are assumed to be true for the purpose of

these motions.  See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002).  In addition, the

Court may consider documents that are attached to the complaint, are incorporated in it by

reference, or are integral to the complaint.  See DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104,

111 (2d Cir. 2010).

        SWI is a Delaware corporation, with its principal place of business in West Virginia.  See

Second Amended Complaint, filed Nov. 15, 2010 (Docket # 48) ("2d Am. Compl.") ¶ 3.  "The

corporate predecessor of [SWI] was Wheeling-Pittsburgh Steel Corporation.  Prior to August 1,

2003, Wheeling-Pittsburgh Steel Corporation was a wholly-owned subsidiary of Wheeling-

Pittsburgh Corporation, which, in turn, was a wholly owned subsidiary of WHX . . . ."  Id. ¶ 28.

SWI operates and is the sponsor of three retirement plans: the Wheeling Corrugating Plan, a

defined contribution plan regulated by ERISA; the Salaried Employees' Pension Plan of

Severstal Wheeling, Inc. (the "Salaried Employees Plan"), also a defined contribution plan

regulated by ERISA; and the Severstal Wheeling, Inc. Pension Plan (the "DB Plan"), a defined

benefit plan regulated by ERISA.  Id. ¶¶ 10-13.  "All three plans are 'employee benefit pension

plans' within the meaning of ERISA Section 3(2)(A), 29 U.S.C. § 1002(2)(A)."  Id. ¶ 10.  "The

Wheeling Corrugating Plan and Salaried Employees Plan specifically provide that any

'Investment Manager' . . . 'shall be solely liable for all investment actions taken concerning the

assets of this Plan.'"  Id. ¶ 47; Wheeling Corrugating Company Retirement Security Plan

(annexed as Ex. A to 2d Am. Compl.) ("Wheeling Corrugating Plan Document") at 31 ¶ 8.110;

Salaried Employees' Pension Plan of Wheeling-Pittsburgh Steel Corporation (annexed as Ex. B

to 2d Am. Compl.) ("Salaried Employees Plan Document") at 29 ¶ 9.11.

Before August 1, 2003, the Wheeling Corrugating Plan and the Salaried Employees Plan "were funded and maintained through the WHX Pension Plan Trust (the 'WHX Pension Trust')." 2d Am. Compl. ¶ 29.  "On August 1, 2003, after a period in bankruptcy, Wheeling-Pittsburgh Corporation became an independently traded public company and was no longer owned by [WHX]." Id. ¶ 30.  On November 27, 2007, Wheeling-Pittsburgh Corporation combined with Esmark Steel Service Group to form Esmark Incorporated.  Id. ¶ 31.  "As a result of this business combination, Esmark Incorporated was renamed Severstal Wheeling Holding Company, Wheeling-Pittsburgh Corporation was renamed Severstal Wheeling Steel Group, Inc." and Wheeling-Pittsburgh Steel Corporation became SWI.  Id. ¶ 32.  "Despite the corporate changes . . . , the Wheeling Corrugating Plan and the Salaried Employees Plan continued to remain invested in the WHX Pension Trust."  Id. ¶ 33.

In the meantime, in February 2004, WHX entered into an Investment Consulting Agreement (the "WHX Investment Agreement") with WPN.  Id. ¶ 34.  The principal and sole executive officer of WPN is LaBow.  Id. ¶ 8.[1]  The WHX Investment Agreement vested WPN with "'complete, unlimited and unrestricted management authority with respect to' the assets in the WHX Pension Trust."  Id. ¶ 34.  This agreement was amended on May 11, 2007 and again in September 2008.  Id.

At some point after 2004, Citibank, N.A. ("Citibank") announced that it would no longer serve as trustee of the WHX Pension Trust, and WHX advised SWI that it would have to transfer

---

[1]  Labow previously had a close connection with WHX.  From 1991-2004, LaBow was the Chairman of the Board of Directors of WHX, id. ¶¶ 28, 61; WPN and WHX once shared an address, id. ¶ 62; and, as of June 30, 2003, "WPN and LaBow owned stock options equivalent to 6.8% of the common stock of WHX," id. ¶ 63.

the Wheeling Corrugating Plan and the Salaried Employees Plan to a trust "separate and apart from the WHX Pension Trust."  Id. ¶ 35.  In September 2008, WHX's Retirement Committee and the SRC "jointly requested that Citibank . . . remove the assets of the Wheeling Corrugating Plan and the Salaried Employees Plan from the WHX Pension Trust to a new Severstal Wheeling Pension Plan (the 'Severstal Trust')."  Id. ¶ 36.  On September 30, 2008, Michael DiClemente, a member of the SRC, "informed Mr. Glen Kassan, the chairman of WHX's Pension Investment Committee, that the assets in the Wheeling Corrugated Plan and the Salaried Employees Plan should be transferred to the Severstal Trust in the same percentage investment allocations as had existed in the WHX Pension Trust."  Id. ¶¶ 37-38.  However, "DiClemente's instructions were not followed and the transfer did not occur on September 30, 2008," the date of the request.  Id. ¶ 39.  On October 22, 2008, LaBow sent DiClemente a letter "advising him that the transfer was not accomplished on September 30, 2008 due to market volatility, but that the transfer would occur on November 3, 2008."  Id. ¶ 40.  This letter was drafted by either James McCabe, an officer of WHX, or Manes Merrit, an outside counsel to WHX, and was sent to LaBow "with instructions to print it on WPN letterhead and send it to Severstal Wheeling."  Id.

"As of October 31, 2008, the total combined value of the Wheeling Corrugated Plan and the Salaried Employees Plan was $38,147,879.00," and because they were then still part of the WHX Pension Trust, these assets were diversified.  Id. ¶ 42.  On October 31, 2008, LaBow directed David Riposo, the Treasurer of WHX, "to transfer all of the assets in an account that was managed by Neuberger Berman LLC ["NB"] while it was part of the WHX Pension Trust (the 'NB Account') to the Severstal Trust at market opening on November 3, 2008."  Id. ¶ 43. The plaintiffs were not aware of this instruction and it was made without their input.  Id.

On November 1, 2008, Severstal Wheeling and WPN entered into an agreement which

4

constituted a third amendment to the WHX Investment Agreement (the "Third Amendment").

See id. ¶ 44; Third Amendment to the Severstal Wheeling, Inc. Investment Management

Agreement (annexed as Ex. E to 2d Am. Compl.) ("Third Amendment") at 1.  "Under the terms

of the Third Amendment, WPN was named the investment manager of the Severstal Trust with

sole discretionary management authority over the assets in the Severstal Trust."   2d Am. Compl.

¶ 46   Labow "'ha[d] the primary responsibility for performing the services of the Manager

[WPN] with respect to the Investment Fund . . . .'"  Id. ¶ 46 (alteration in original); Third

Amendment at 3 ¶ (I).  The Third Amendment also "obligated WPN to manage the Severstal

Trust assets in accordance with the Severstal Wheeling Pension Plan Investment Policy (the

'Severstal Investment Policy')."  2d Am. Compl. ¶ 48.  The Severstal Investment Policy required

WPN to "'ensure that the [Severstal Trust's] assets [were] well diversified with respect to the

type of assets, investment strategies employed and number of investment managers used.'"  Id.

¶ 50; Severstal Investment Policy (annexed as Ex. F to 2d Am. Compl.) at 2.

On November 3, 2008, DiClemente directed Citibank to transfer the NB Account from

the WHX Pension Trust to the Severstal Trust.  2d Am. Compl. ¶ 51.  "The language of

[DiClemente's] letter was drawn from language provided by WHX."  Id.  WHX similarly

advised Citibank that the transfer was to take place.  Id. ¶ 52.  "In accordance with these . . .

communications, $31,446,845.00 – the entirely of which was invested in the [NB account], was

transferred from the WHX Pension Trust to the Severstal Trust."  Id. ¶ 53.  The difference

between the value of the assets transferred and the total amount of funds belonging to the

Severstal Trust, $38,147,879.00, is referred to as the "True-Up Amount," and was left in the

WHX Pension Trust "without the concurrent knowledge or agreement of the [SRC]."  Id.  In

other words, "[d]efendants, . . . as fiduciaries and investment managers, failed to ensure that the

entire difference was immediately transferred from the WHX Pension Trust to the Severstal Trust." Id.

LaBow and WHX had a secret agreement "to protect the assets of the WHX Pension Trust to the detriment of the Severstal Trust." Id. ¶ 65. WHX "desired to have no association with the [NB Account]." Id. ¶ 64. Kassan, "in a joint telephone conference call with and among WHX and Severstal Wheeling representatives, described the [NB Account] as a 'toxic asset' and specifically indicated that WHX wanted nothing to do with [the account]." Id. "By investing the Severstal Trust in the [NB Account] while . . . divesting the WHX Pension Trust from the [NB Account], WPN and LaBow accomplished exactly what WHX wanted to the detriment of the Severstal Trust." Id. ¶ 65. Defendants favored and gave preferential treatment to the WHX Pension Trust, by "divesting the WHX Pension Trust of the 'toxic assets' in the [NB Account]" and investing those in the Severstal Trust, and by failing to diversify the Severstal Trust while diversifying the WHX Pension Trust. Id. ¶ 66. Evidence of this secret agreement includes an indemnification agreement that was entered into by LaBow and WHX on November 25, 2008. "[T]he agreement, which was drafted by representatives of WHX . . . , asked LaBow and WPN to indemnify WHX 'in connection to' 'the determination . . . as to which assets of the WHX Pension Trust were transferred, or should have been transferred, to the [Severstal] Trust.'" Id. ¶ 58 (alteration in original).

"Once the assets in the [NB Account] were transferred to the Severstal Trust, they were . . . no longer managed by [NB] and [p]laintiffs did not have any inherent obligation to have them managed by [NB]." Id. at 10 n.1. NB was not actively managing the assets in the NB Account, because WPN and LaBow "failed to enter into an agreement with [NB] for the management of the assets in the [NB Account]." Id. ¶ 54.

6

At the time the SRC requested the transfer of the NB Account to the Severstal Trust, the SRC "expected that either the Severstal Trust would receive only a portion of the [NB Account] along with a portion of all of the other investments comprising the WHX Pension Trust, or that, if the Severstal Trust would receive the entire [NB Account], the [NB Account] would be liquidated and the Severstal Trust Assets diversified." Id. ¶ 55. However, WPN and LaBow left the Severstal Trust invested entirely in the NB Account, which "was not under active investment management at the time." Id. ¶ 56. The NB Account was "composed of thirteen stocks, the overwhelming majority of which were energy stocks." Id. ¶ 57. LaBow, who was a former investment banker with NB, left the Severstal Trust assets invested solely in the NB account "because of his previous relationship with [NB] and/or because of pecuniary or other benefits that were being conferred upon him by [NB]." Id. ¶ 60.

On December 29, 2008, the SRC became aware that the assets in the Severstal Trust were entirely invested in the NB Account. Id. ¶ 67. On December 30, 2008, DiClemente e-mailed LaBow and informed him that the SRC had learned of the transfer of the NB Account to the Severstal Trust, that only the NB Account had been transferred to the Severstal Trust, and that NB had not been managing the assets in the Severstal Trust. Id. ¶ 68. However, at the time DiClemente sent the e-mail, he was not aware that the NB Account was "an undiversified account" composed almost entirely of energy stocks. Id. ¶ 69. After learning this "troubling fact," DiClemente and the SRC asked defendants, verbally and in writing numerous times in December 2008 and January 2009, to "prepare a written plan to retroactively re-allocate the assets in both the WHX Pension Trust and the Severstal Trust so that the percentage allotment of the various investments was the same in both trusts." Id. ¶¶ 69, 70. On February 4, 2009, LaBow, on behalf of WPN, sent a letter acknowledging that it was the "Defendants' decision,

based on . . . 'market conditions,' to 'transfer the entire [NB Account]' to the Severstal Trust."
Id. ¶ 71.  In addition, LaBow stated "that he could not have allocated a pro rata share of each
investment in the WHX Pension Trust to the Severstal Trust in the first place because he 'ran
across major roadblocks,' with the implication that no such re-allocation was even possible."  Id.
¶ 72.

Initially, the plaintiffs were told that a "retroactive reallocation would be accomplished
which would restore to the Severstal Trust a balanced Portfolio."  Id. ¶ 73.  Eventually, however,
the plaintiffs learned that the defendants could not perform a "retroactive reallocation."  Id.
Defendants refused to retroactively reallocate because a reallocation of the assets "would have
resulted in the WHX Pension Trust re-assuming its proportionate share of the 'toxic assets' in
the [NB Account]."  Id. ¶ 74.  On March 31, 2009, WHX transferred the last of True-Up Amount
to the Severstal Trust.  Id. ¶ 76.  "WPN and Labow continued their failure or refusal to properly
diversify the Severstal Trust."  Id. ¶ 77.

"As of March 31, 2009, the Severstal Trust's investments in the [NB Account] were
valued at $24,276,162.00."  Id. ¶ 78.  When compared to their value of $31,446,845.00 as of
October 31, 2008, "the Severstal Trust's holdings in the [NB Account] were devalued by
approximately 19%."  Id.  Had the Severstal Trust been diversified, it would not have suffered
this magnitude of lost value and indeed might have increased in value.  Id. ¶¶ 79, 80.

On March 23, 2009, LaBow left a voicemail message for Sally Doubet King, plaintiffs'
previous counsel, in which he accepted responsibility for the lack of diversification in the
Severstal Trust, admitted that "he 'still [hadn't] diversified the Severstal Trust['], that he was
going to 'liquidate the account when [he] thought it [was] appropriate [to turn] the whole thing
into cash and go to diversification . . . .'"  Id. ¶ 82.  LaBow also left a voicemail message with

8

Dennis Halpin, a member of the SRC, in which he again admitted that the Severstal Trust had not been diversified and that he was taking responsibility for the failure.  See id. ¶ 83.

On March 24, 2009, "WPN and LaBow liquidated the Severstal Trust's holding in the NB Account."  Id. ¶ 84.  These assets were not reinvested by WPN, "but were instead left in holdings of cash."  Id. ¶ 85.  From March to May 2009, WPN and LaBow "failed to reinvest the Severstal Trust assets in a way that comported with the diversification standards of ERISA and the Severstal Investment Policy."  Id. ¶ 86.  As a result, on May 19, 2009, SWI "terminated the Third Amendment and severed all agreements" with WPN.  Id. ¶ 87.

B.    Procedural History

Plaintiffs filed their original complaint on February 5, 2010.  See Complaint, filed Feb. 5, 2010 (Docket # 1), alleging claims against only WPN and LaBow.  See id.  Since then, plaintiffs have filed a second amended complaint, which we refer to as "the complaint."  It names WPN, LaBow, and WHX as defendants and alleges the following claims for relief: (1) breach of fiduciary duty under section 502(a)(2) of ERISA by failing to loyally manage plan assets in violation of ERISA sections 404(a)(1)(A) and 406(b) against all defendants; (2) breach of fiduciary duty under section 502(a)(2) of ERISA by failing to adequately diversify plan assets in violation of ERISA section 404(a)(1)(C) against all defendants; (3) knowing participation of a fiduciary breach by a non-fiduciary under section 502(a)(3) of ERISA against WHX; (4) two counts of breach of contract against WPN; and (5) and a claim of professional negligence against LaBow.  See 2d Am. Compl. ¶¶ 103-52.

On January 5, 2011, LaBow and WPN filed a motion to dismiss the second amended

complaint.[2]  WHX filed its motion to dismiss on January 19, 2011.[3]  On April 4, 2011, the

parties consented to have the undersigned decide these motions.  See Notice, Consent, and

Reference of a Dispositive Motion to a Magistrate Judge, filed Apr. 4, 2011 (Docket # 69).

II.     LAW GOVERNING MOTIONS TO DISMISS

        A party may move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) where the opposing

party's complaint "fail[s] to state a claim upon which relief can be granted . . . ."  While a court

must accept as true all of the allegations contained in a complaint, that principle does not apply

to legal conclusions.  See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009); Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 555 (2007) ("a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do") (citation, internal quotation marks, and brackets

omitted).  In other words, "[t]hreadbare recitals of the elements of a cause of action, supported

by mere conclusory statements, do not suffice," Iqbal, 129 S. Ct. at 1949, and thus a court's first

_____

    [2]  See Notice of Motion by Defendants WPN Corporation and Ronald LaBow to Dismiss
the Amended Complaint Pursuant to Rule 12(b)(6), Fed. R. Civ. P., filed Jan. 5, 2011 (Docket
# 51); Good Faith Declaration of Daniel Cobrinik, filed Jan. 5, 2011 (Docket # 53); "Plaintiffs'
[sic] Memorandum of Law in Support of Motion to Dismiss Plaintiffs' Second Amended
Complaint Pursuant to Rule 12(b)(6) Fed. R. Civ. P.," filed Jan. 5, 2011 (Docket # 54)
("WPN/LaBow Memo"); Memorandum of Law in Opposition to WPN Corporation's and
Ronald LaBow's Motion to Dismiss, filed Jan. 21, 2011 (Docket # 61) ("Pl. Op. Mem.
WPN/LaBow"); Reply Memorandum of Law of Defendants WPN Corporation and Ronald
LaBow in Further Support of Motion to Dismiss the Second Amended Complaint, filed Jan. 31,
2011 (Docket # 63) ("WPN/LaBow Reply").

    [3]  See Notice of Motion by Defendant WHX Corporation to Dismiss the Second
Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6), filed Jan. 19, 2011 (Docket # 59);
Memorandum of Law in Support of WHX Corporation's Motion to Dismiss, filed Jan. 19, 2010
(Docket # 60) ("WHX Memo"); Memorandum of Law in Opposition to WHX Corporation's
Motion to Dismiss, filed Feb. 2, 2011 (Docket # 64) ("Pl. Op. Mem. WHX"); Reply
Memorandum of Law in Further Support of WHX Corporation's Motion to Dismiss, filed Feb.
14, 2011 (Docket # 66) ("WHX Reply").

task is to disregard any conclusory statements in a complaint, id. at 1949-50.

Next, a court must determine if the complaint contains "sufficient factual matter" which, if accepted as true, states a claim that is "plausible on its face." Id. at 1949 (citation and internal quotation marks omitted); accord Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) ("a complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion"). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 127 S. Ct. at 1949 (citations and internal quotation marks omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint is insufficient under Fed. R. Civ. P. 8(a) because it has merely "alleged" but not "'show[n] . . . that the pleader is entitled to relief.'" Id. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

III.   WPN AND LABOW'S MOTION TO DISMISS

We address the defendants' motions to dismiss separately.

A.   ERISA Breach of Fiduciary Duty Claim (Count I)

In Count I of the complaint, plaintiffs allege that WPN and LaBow (sometimes referred to collectively as "WPN") were fiduciaries and breached their duty to loyally manage plan assets in violation of ERISA sections 404(a)(1)(A) and 406(b) by (1) "failing to disclose . . . LaBow's previous relationship and dealings with [NB]," 2d Am. Compl. ¶ 106; (2) "investing the entirety of the Severstal Trust in the [NB Account because] of . . . LaBow's relationship and dealings with [NB]," id. ¶ 107; and (3) "giving preferential treatment to the WHX Pension Trust over the

11

Severstal Trust," id. ¶ 108.[4]  WPN and LaBow do not contest that they were fiduciaries of the

Severstal Trust.

      "To state a claim under ERISA . . . for breach of [a] fiduciary duty, plaintiffs must allege

that (1) defendants were fiduciaries of the plan who, (2) acting within their capacities as plan

fiduciaries, (3) engaged in conduct constituting a breach of an ERISA fiduciary duty."  See In re

Pfizer Inc. ERISA Litig., 2009 WL 749545, at *6 (S.D.N.Y. Mar. 20, 2009) (citing 29 U.S.C.

§ 1109; Pegram v. Herdrich, 530 U.S. 211, 222-224 (2000)).  ERISA requires that fiduciaries

discharge their duties "solely in the interest of the [ERISA plan] participants and beneficiaries

and . . . for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries;

and (ii) defraying reasonable expenses of administering the plan."  29 U.S.C. § 1104(a)(1)(A).

In addition, they must do so, "with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

matters would use in the conduct of an enterprise of a like character and with like aims."  29

U.S.C. § 1104(a)(1)(B).  They must discharge these duties "in accordance with the documents

and instruments governing the plan."  29 U.S.C. § 1104(a)(1)(D).  We now examine each of the

three allegations regarding breach of fiduciary duty.

      With respect to the issue of LaBow's alleged failure to disclose his previous relationship

and dealings with NB, 2d Am. Compl. ¶ 106, we note that "the duty of loyalty requires

fiduciaries to refrain from actual disloyal conduct, not simply running the risk that such behavior

---

    [4]  In their opposition papers, plaintiffs argue that WPN also breached the duty of loyalty
by failing to diversify the assets in the Severstal Trust.  See Pl. Op. Mem. WPN/LaBow at 10.
This allegation is not made in Count I of the complaint, however, see 2d Am. Compl. ¶¶ 103-13,
and therefore we do not address it.  We note in passing that Count II of the complaint alleges that
WPN's failure to diversify the assets in the Severstal Trust constituted a breach of the ERISA
duty to diversify.  WPN has not moved to dismiss this count.

will occur." In re McKesson HBOC, Inc. ERISA Litig., 391 F. Supp. 2d 812, 834-35 (N.D. Cal. 2005); In re Bear Stearns Cos. Secs., Derivative & ERISA Litig., 763 F. Supp. 2d 423, 578-79 (S.D.N.Y. 2011). Thus, the fact that a plan fiduciary has a conflict of interest does not by itself constitute a breach of fiduciary duty. Instead, plaintiffs must show that the improper relationship or conflict caused the fiduciary to act disloyally. See In re Bear Stearns Cos., 763 F. Supp. 2d at 578-79 ("Without pointing to an underlying breach of the duty of loyalty, ERISA Plaintiffs cannot establish that the alleged conflict of interest had adverse consequences."); Herrara v. Wyeth, 2010 WL 1028163, at *7 (S.D.N.Y. Mar. 17, 2010) ("In the absence of a valid claim for a breach of the duty of loyalty, allegations that Defendants placed themselves into a conflict situation are not independently actionable."); In re Xerox Corp. ERISA Litig., 483 F. Supp. 2d 206, 218-19 (D. Conn. 2007) ("the cognizable claim with respect to any alleged conflict of interest is not that the fiduciary is subject to a conflict of interest, but rather that in discharging his or her duties under a Plan, the fiduciary breached his or her duty of loyalty"). For this reason, a mere failure to disclose does not by itself constitute a breach of a fiduciary duty. See Am. Med. Ass'n v. United Healthcare Corp., 2001 WL 863561, at *9 (S.D.N.Y. July 31, 2001) ("there is scant support for an obligation on ERISA fiduciaries to disclose truthful information beyond what they are statutorily obligated to disclose"). Where courts have found that a fiduciary's failure to disclose information constituted a breach of the duty of loyalty, they have done so only when the omission has caused harm to the plan. See, e.g., Am. Med. Ass'n, 2001 WL 863561, at *9; Weiss v. CIGNA Healthcare, Inc., 972 F. Supp. 748, 754-55 (S.D.N.Y. 1997). Plaintiffs do not allege that WPN and LaBow's failure to disclose LaBow's relationship and dealings with NB, in and of itself, caused harm to the plans. Thus, LaBow's mere failure to disclose his previous relationship with NB does not constitute a breach of the duty of loyalty.

The second manner in which plaintiffs contend that WPN and LaBow breached their fiduciary duty is that they invested the Severstal Trust entirely in the NB Account because of LaBow's relationship with NB.  See 2d Am. Compl. ¶ 107.  Here, the complaint may be fairly read to indicate an actual harm to the plaintiffs: that the NB Account was transferred in toto and that the assets remained undiversified for a period of five months.  See, e.g., 2d Am. Compl. ¶¶ 66, 77, 84-85.  We must also credit the allegations that LaBow undertook this action "because of" his relationship with NB, see id. ¶ 107; see also id. ¶¶ 40, 43, 51, 60-64, and not because he thought it was in the best interest of the Severstal Trust.  While the allegations do not provide strong evidence of this fact, the complaint meets the minimum "plausibility" threshold on this point.  Finally, while the complaint alleges that the actual transfer took place at the direction of plaintiff, id. ¶ 51, this does not negate the additional allegation that LaBow had significant involvement in this decision, id. ¶ 43.  See generally LaScala v. Scrufari, 479 F.3d 213, 219 (2d Cir. 2007) ("[O]ne fiduciary's knowledge of another fiduciary's breach does not excuse that breach; to the contrary, pursuant to ERISA § 405a)(3), 29 U.S.C. § 1105(a)(3), one fiduciary's knowledge of another's breach can make the first fiduciary liable for the other's breach.").  Accordingly, the complaint is sufficient to state a breach of the duty of loyalty claim against WPN and LaBow based on the transfer and the failure to diversify.  See generally In re Am. Intern. Grp., Inc. ERISA Litig. II, 2011 WL 1226459, at *10 (S.D.N.Y. Mar. 31, 2011) (plaintiffs' allegations are sufficient to state a claim for breach of the duty of loyalty where allegations show that defendants engaged in specific conduct that caused injury to plan participants); In re Pfizer ERISA Litig., 2009 WL 749545, at *13 (allegations are sufficient to establish a claim for breach of the ERISA duty of loyalty were they tend to show that plan fiduciaries did not act with "an eye single to the interests of participants and beneficiaries" of the

plan) (internal quotation marks omitted).

Finally, plaintiffs allege that there was a breach of duty because WPN and LaBow gave "preferential treatment to the WHX Pension Trust over the Severstal Trust," 2d Am. Compl. ¶ 108. We view this allegation simply as a reiteration of the allegation made in the previous paragraph of the complaint regarding the alleged breach of fiduciary duty that resulted in the investment of funds in the NB Account. Accordingly, it is not necessary to treat it separately.

B.   Pendent State Law Claims

In addition to the ERISA claim, the second amended complaint alleges two breach of contract claims against WPN and a claim for professional misconduct against LaBow. All three of these claims have been brought solely by SWI.

While the claims arise under state law, no party has briefed the issue of choice of law. Because all parties have relied on New York State law in their memoranda of law, they have implicitly consented to the application of New York law. This "'implied consent . . . is sufficient to establish choice of law.'" Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (alteration in original) (quoting Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989))

1.   Breach of Contract Against WPN (Count IV)

In Count IV of the second amended complaint, SWI asserts that WPN breached the Third Amendment in various ways, as described in the Counts I and II arising under ERISA. 2d Am. Compl. ¶¶ 128-39. Count IV is not brought by all the plaintiffs, however, but only by SWI. And SWI does not do so because of any losses to the Severstal Trust, but rather because of the losses SWI itself incurred as a result of its own increased obligation to fund the DB Plan, which

15

had no contractual arrangement with WPN.  See id. ¶¶ 138-39.[5]  SWI's claim is based on the following syllogism: that beneficiaries of the Salaried Employees Plan were entitled to a certain level of benefits; that any reduction in funds available from the Salaried Employees Plan meant that the DB Plan was responsible for making up those reductions; and that this increased payout was borne by SWI.  Id.; see id. ¶ 15.  This claim fails, however, because there is nothing in the complaint or any of the attached documents alleging that the parties contemplated that a breach of the Third Amendment made WPN responsible for losses emanating from SWI's obligation to fund benefits under the DB Plan.

The damages sought for this count are plainly not direct or general damages.  Such damages arise when "when the non-breaching party seeks only to recover money that the breaching party agreed to pay under the contract."  Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 109 (2d Cir. 2007).  Here, SWI does not contend that the terms of the Third Amendment or the predecessor agreements obligate WPN to pay SWI's losses resulting from SWI's obligations to fund the DB Plan.  Accordingly, what SWI seeks are consequential or special damages.  Under New York law, "[i]n order to recover 'special' or extraordinary contract damages that do not flow directly from the breach, however, a plaintiff is required to plead that

---

[5]  Specifically, the complaint alleges:

Because the Salaried Employees Plan was linked to the DB Plan in a floor offset arrangement, the losses to the Salaried Employees Plan caused the DB Plan to payout more in benefits than it otherwise should have been required to pay and increased [SWI's] funding obligations to the DB Plan. . . .  [SWI's] losses in this regard were the direct and proximate result of WPN's breach of its contractual obligations to [SWI].  Had WPN performed its contractual obligations as listed, [SWI's] funding obligations to the DB Plan would not have increased to the level that they did.

Id. ¶¶ 138-39.

the damages were foreseeable and within the contemplation of the parties at the time the contract was made." Reads Co., LLC v. Katz, 72 A.D.3d 1054, 1056 (2d Dep't 2010); accord Kenford Co. v. County of Erie, 73 N.Y.2d 312, 319 (1989) (damages must be "within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting"). SWI has plead no such facts in the instant case. Nor is there anything in the contract documents themselves that would suggest that the parties contemplated that any breach by WPN meant that WPN would be responsible for indemnifying SWI for any additional payments it had to make under the DB Plan. Plaintiffs cite to case law holding that the question of whether damages are direct or consequential is a question of fact. Pl. Op. Mem. WPN/LaBow at 17-18. But these cases are irrelevant as plaintiffs have alleged no facts that show that SWI's increased payments to the DB Plan were contemplated by the parties or were otherwise legally compensable.

   2.   Breach of Contract Against WPN (Count V)

   In Count V, SWI alleges that under the Second Amendment to the WHX Investment Agreement and the Third Amendment, WPN was contractually bound to "obtain and maintain in effect a fiduciary liability insurance policy or policies for the benefit of the Client . . . " and that WPN never complied with this obligation. 2d Am. Compl. ¶¶ 141-43. SWI alleges that this failure will cause "Plaintiffs" monetary losses. Id. ¶ 144. WPN's sole basis for arguing that this claim must be dismissed is that the only plaintiff pursuing this claim, SWI, is not a party to the Third Amendment, the governing contract, and thus "has no rights under the agreement." WPN/LaBow Memo at 17.

   If the face of the complaint were relied on, this argument would be quickly rejected as the complaint unmistakably alleges that SWI is indeed a party to the Third Amendment, 2d Am. Compl. ¶¶ 45, 132. WPN asks the Court to examine the Third Amendment itself, however,

17

which has been annexed to and incorporated into the complaint, and notes that the party to that

agreement is identified as "Severstal Wheeling, Inc. . . . . on behalf of the Wheeling-Pittsburgh

Steel Corporation Pension Plan Trust," Third Amendment at 1 (emphasis added) – not simply

SWI.  The phrase "on behalf of," however, is simply too ambiguous to allow a conclusion at this

stage of the proceedings that SWI is not itself a party to the agreement.  And, indeed, there is

evidence supporting the notion that SWI is a party to the agreement.  The Third Amendment

uses the abbreviation "SWI" throughout the document to refer to SWI, the corporate entity, not

SWI as a fiduciary of the Severstal Trust.  See id. at 1 ("and Severstal Wheeling, Inc. ('SWI,' as

successor to Wheeling-Pittsburgh Steel Corporation")), 5, 6.  Additionally, the Third

Amendment places obligations on SWI that are not dependent on SWI acting in a fiduciary

capacity.  See Third Amendment at 5 ¶ 16(a) ("SWI agrees to indemnify and hold harmless the

Manager and its affiliates . . . from and against any losses . . . that are imposed upon or incurred

by the Manager and its affiliates . . . as a result of SWI's or the Committee's breach of its

representations and warranties made under the Agreement.").[6]

    These provisions are enough to conclude that SWI has adequately alleged that it is a

---

[6] There is another indication in the agreements that SWI is itself a party.  The original
WHX Investment Agreement defined "WHX Corporation, a Delaware corporation, on behalf of
the WHX Pension Plan Trust" as "together, the 'Client.'"  See WHX Investment Agreement
(annexed as Ex. D to Am. Compl.) at 1.  The only reference to the term "Client" in any of the
subsequent amendments to the WHX Investment Agreement states that the term "Client" refers
"separately to both WHX Corporation and the WHX Pension Plan Trust."  First Amendment to
the WHX Investment Agreement (annexed as Ex. D to 2d Am. Compl.) at 1 ¶ 27(a) (emphasis
added).  The term's definition remains in full force and effect.  See Third Amendment at 7 ¶ 10;
Second Amendment to the WHX Investment Agreement (annexed as Ex. D to 2d Am. Compl.)
at 1.  Because the term "Client" in the WHX Investment Agreement refers to both WHX
Corporation and the WHX Pension Plan Trust, the term Client in the Third Amendment – a
contract solely between WPN and SWI – arguably refers both to SWI and to the Severstal Trust.

party to the Third Amendment.  It is of no moment that, as WPN points out, WPN/LaBow Memo at 14; WPN/LaBow Reply at 7, the Third Amendment required WPN and LaBow to notify only the SRC if there was "any change . . . with respect to the Investment Fund or the Manager," Third Amendment at 3 ¶ (l), as this language does not render SWI a non-party to the contract. Moreover, even if SRC is a third-party beneficiary of the agreements, this would not affect SWI's ability to sue to enforce its own contractual rights.  See, e.g., Associated Teachers of Huntington, Inc. v. Bd. of Ed., Union Free Sch., Dist. No. 3, Town of Huntington, 33 N.Y.2d 229, 234 (1973) ("promisee has an undisputed right to enforce the contract made for the benefit of third parties").[7]

Accordingly, WPN's motion to dismiss Counts V of the second amended complaint is denied.

### 3.    Professional Negligence Against LaBow (Count VI )

In Count VI of the complaint, SWI sues LaBow for professional malpractice.  SWI seeks damages against LaBow that are similar to the damages it sought in Count IV: that is, the amounts of money it was required to add to the DB Plan resulting from losses to the Salaried Employees Plan.  See 2d Am. Compl. ¶ 152.

---

[7] Nor is SWI rendered a non-party to the Third Amendment because, as WPN argues, see WPN/LaBow Memo at 14-15; WPN/LaBow Reply at 8, DiClemente identified his title on the signature page as "member of the SWI Retirement Committee," Third Amendment at 8. While this notation indicates that DiClemente was a member of the SRC at the time he signed the Third Amendment, it does not establish that DiClemente did not have authority to sign the contract on behalf of SWI or bind SWI contractually.

Additionally, to the extent SWI has an interest in enforcement of the contract because it is a fiduciary of the Severstal Trust for whom an insurance policy was required to be purchased, it may be that SWI is itself a third-party beneficiary of the agreements and would have standing to pursue a claim to enforce that clause for its own benefit.

LaBow argues that he cannot be sued by SWI because the DB Plan was not a client of LaBow's.  WPN/LaBow Memo at 17-18.  But, as SWI points out, SWI was a client of LaBow, and thus the case law cited by LaBow, id. at 18, holding that claims for professional malpractice cannot be made by non-clients is irrelevant.  LaBow's appeal to SWI's status as a non-client appears to be the only argument it makes in seeking dismissal of Count VI.  See id.

In a concluding paragraph, however, LaBow states that the claim fails because "there is no allegation that LaBow could have foreseen losses to the DB Plan arising from investment decisions for the SEP Plan."  Id.  It appears that this sentence was intended to summarize LaBow's argument regarding SWI's status as a non-client inasmuch as it cites no further case law to support it.  But, taken on its face – and without reference to the "non-client" argument – it may raise a significant impediment to pursuit of the malpractice claim: that the particular category of damages sought there – the amounts of money SWI paid to make up losses to beneficiaries of the DB Plan – were not "foreseeable."  See, e.g., In re Gouiran Holdings, Inc., 165 B.R. 104, 106 (E.D.N.Y. 1994) ("under New York law, the test for proximate, or 'legal,' cause is whether it was reasonably foreseeable that the damage incurred would follow from the wrongful act") (citing Saugerties Bank v. Del. & Hudson Co., 236 N.Y. 425, 430 (1923)).  This ground for dismissal, however, was not clearly raised, and thus the Court will not address it at this time.

As to LaBow's contention that a professional advisor can never be liable for malpractice, WPN/LaBow Memo at 18-19, panels of the Appellate Division, First Department, in recent years have recognized such claims, see Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt., Inc., 80 A.D.3d 293, 306 (1st Dep't 2010) ("An investment advisor may be considered a professional.") (citations omitted); Bullmore v. Ernst & Young Cayman Is., 45 A.D.3d 461, 463 (1st Dep't

20

2007) ("Professionals such as investment advisors, who owe fiduciary duties to their clients, 'may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties,' since in 'these instances, it is policy, not the parties' contract, that gives rise to a duty of due care.") (citations omitted), and thus we believe that the New York Court of Appeals would do so as well were it presented with the question, see generally Jaramillo v. Weyerhaeuser Co., 2007 WL 194011, at *2 (S.D.N.Y. Jan. 24, 2007) (where New York Court of Appeals has not determined an issue, a federal court interpreting New York law "must look to the New York Appellate Division for guidance . . . ."), aff'd, 570 F.3d 487 (2d Cir. 2009).  The cases relied upon by LaBow pre-date the First Department rulings and are in any event distinguishable.  See Deutsch Bank Sec., Inc. v. Rhodes, 578 F. Supp. 2d 652, 670-71 (S.D.N.Y. 2008) (investment bank does not act as a professional when it was retained by a company solely to arrange for the sale or issuance of securities) (not discussing status of investment advisors); Steed Fin. LDC v. Laser Advisers, Inc., 258 F. Supp. 2d 272, 284 (S.D.N.Y. 2003) (complaint devoid of allegations that tended to show a professional relationship existed between the parties and that a duty was owed by the defendant to the plaintiff); Leather v. U.S. Trust Co. of N.Y., 279 A.D.2d 311, 312 (1st Dep't 2001) (noting in dictum that the plaintiff failed to make a showing that defendants, a financial planning company, were professionals); Dimsey v. Bank of N.Y., 14 Misc. 3d 1205A, 2006 WL 3740349, at *4 (N.Y. Sup. Ct. 2006) (relying on pre-Bullmore case to find that plaintiff had not met his burden of showing that a financial planning company was a professional).

Accordingly, LaBow's motion to dismiss SWI's professional negligence claim is denied.

IV.    WHX'S MOTION TO DISMISS

    A.    Claims Brought Pursuant to ERISA Section 502(a)(2) (Counts I and II)

Plaintiffs allege that WHX was a fiduciary and breached two fiduciary duties owed to the

plaintiffs: (1) the duty to loyally manage plan assets in violation of ERISA sections 404(a)(1)(A)

and 406(b), 2d Am. Compl. ¶¶ 103-13, and (2) the duty to adequately diversify plan assets in

violation of ERISA section 404(a)(1)(C), id. ¶¶ 114-21.  "To state a claim under ERISA . . . for

breach of fiduciary duty, plaintiffs must allege that (1) defendants were fiduciaries of the plan

who, (2) acting within their capacities as plan fiduciaries, (3) engaged in conduct constituting a

breach of an ERISA fiduciary duty."  See In re Pfizer Inc. ERISA Litig., 2009 WL 749545, at *6

(citing 29 U.S.C. § 1109; Pegram, 530 U.S. at 222-24.

    ERISA provides that a person is a "fiduciary" when

> (I) he exercises any discretionary authority or discretionary control respecting
> management of such plan or exercises any authority or control respecting
> management or disposition of its assets, (ii) he renders investment advice for a fee
> or other compensation, direct or indirect, with respect to any moneys or other
> property of such plan, or has any authority or responsibility to do so, or (iii) he
> has any discretionary authority or discretionary responsibility in the
> administration of such plan.

29 U.S.C. § 1002(21)(A).  ERISA's definition of fiduciary is "to be broadly construed," and

"[u]nlike the common law definition of fiduciary, which rests "'on the position a person holds,'

ERISA's definition of fiduciary rests on the function a person plays."  Finkel v. Union Elevator

Corp., 2011 WL 1655573, at *2 (E.D.N.Y. May 2, 2011); see LoPresti v. Terwilliger, 126 F.3d

34, 40 (2d Cir. 1997) (citations omitted).  "Fiduciary status under ERISA arises from being

named as a fiduciary in plan documents or through the performance of fiduciary functions."  In

re Pfizer Inc. ERISA Litig., 2009 WL 749545, at *6; In re Lehman Bros. Secs. & ERISA Litig.,

683 F. Supp. 2d 294, 298 (S.D.N.Y. 2010) ("Fiduciaries are those (1) so named in the plan, or

(2) who exercise fiduciary functions.").  Further, it is settled that "[a] person may be a fiduciary with respect to certain matters, but not others, for he has that status only to the extent that he has or exercises the described authority or responsibility."  F.H. Krear & Co. v. Nineteen Named Trs., 810 F.2d 1250, 1259 (2d Cir. 1987) (internal quotation marks omitted); accord Bell v. Pfizer, Inc., 626 F.3d 66, 74 (2d Cir. 2010); Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co., 302 F.3d 18, 28 (2d Cir. 2002); Gray v. Briggs, 45 F. Supp. 2d 316, 328 (S.D.N.Y. 1999).

Because plaintiffs concede that WHX was not a named fiduciary of the plans at issue, Pl. Op. Mem. WHX at 8, the only question is whether the complaint alleges that WHX was performing a fiduciary function when taking the action subject to the complaint.  See Pegram, 530 U.S. at 226 ("In every case charging breach of ERISA fiduciary duty, then, the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person . . . was performing a fiduciary function[] when taking the action subject to complaint."); accord Fisher v. JP Morgan Chase & Co., 703 F. Supp. 2d 374, 381-82 (S.D.N.Y. 2010).  Plaintiffs contend that WHX was a fiduciary of the plans at issue because it fit within the portion of the statute that makes a person a fiduciary who "exercises any authority or control respecting management or disposition of its assets."  See Pl. Op. Memo WHX at 9.  They emphasize that to maintain that WHX is a fiduciary under this portion of the statute, it is not required to show that WHX exercised any "discretionary" authority.  Plaintiffs argue that "[m]ere authority or control of any kind over the disposition of plan assets is sufficient to establish fiduciary status."  Id.

To demonstrate this authority or control, plaintiffs point to the allegations that (1) McCabe of WHX drafted the text of the October 22, 2008 letter that LaBow sent to Severstal

Wheeling in which LaBow stated that the transfer of assets would not occur until November 3, 2008, 2d Am. Compl. ¶ 40; (2) LaBow gave instructions to WHX to transfer assets on October 31, 2008, id. ¶ 43; (3) the plan "direct[ed]" Citibank on November 3, 2008, to transfer the assets from the NB account in "language that was provided by WHX," id. ¶ 51; and (4) WHX advised Citibank of this same fact, id. ¶ 52.  See Pl. Mem. Op. WHX at 9-10.  Plaintiffs argue that these allegations demonstrate that WHX had "control over the disposition of the assets at issue," even though it concedes that any transfer was "accomplished at LaBow's explicit instructions."  Pl. Op. Mem. WHX at 10.[8]

These allegations fall far short of showing that WHX had "authority or control" over management or disposition of the plan's assets.  As the Second Circuit has noted, "although Congress intended the term "fiduciary to be broadly construed, even this broad construction has limits."  Bell, 626 F.3d at 74 (internal quotation marks and citations omitted).  And it is well settled that ERISA does not extend fiduciary status to a party merely because it possesses a plan's assets.  See Briscoe v. Fine, 444 F.3d 478, 494 (6th Cir. 2006) ("ERISA's statutory definition will not extend fiduciary status to every person who exercises mere possession, or custody over the plans' assets.") (citations and internal quotation marks omitted); Chao v. Day, 436 F.3d 234, 237 (D.C. Cir. 2006) (same); LoPresti, 126 F.3d at 40-41 (court declines to extend fiduciary status to an owner of a corporation who was aware that ERISA funds were being placed in his company's general account).  Rather, the "people who have practical control over an ERISA plan's money have fiduciary responsibility to the plan's beneficiaries."  Briscoe, 444 F.3d at 494 (citations and internal quotation marks omitted).

---

[8]  Plaintiffs's argument, see Pl. Op. Mem. WHX at 9-10, does not rely on the allegation that WHX was a fiduciary with respect to the "true-up" amount, 2d Am. Compl. ¶ 53.

Here, the allegations in the second amended complaint and the documents attached are unequivocal that the plans' investment managers, LaBow and WPN, were vested with sole authority to manage or dispose of the assets in the respective plans.  See 2d Am. Compl. ¶¶ 44-46; Wheeling Corrugating Plan Document at 31 ¶ 8.110; Salaried Employees Plan Document at 29 ¶ 9.11.  While the complaint alleges a Svengali-like role on the part of WHX in advising or influencing WPN, it at no time suggests that WHX had the legal authority to make any decision concerning the management or disposition of the plans' assets or the practical ability to effectuate any such decision.  Rather, the only entities that could make any decisions on the management or disposition of the plans' assets, the complaint alleges, were the plans themselves, and the investment manager, WPN, which the plans hired for this purpose.

To the extent plaintiffs are arguing that a person or entity who imprudently advises a fiduciary on how to manage or dispose of a plan's assets thereby itself becomes a fiduciary, we reject this argument as inconsistent with the language of the statute and unsupported by case law. Such conduct may amount to the importuning, entreating or badgering of the fiduciary – but it does not constitute the "exercise of authority or control."  To the extent that plaintiffs' argument rests on the fact that it was necessary for WHX to provide a signed authorization to Citibank to transfer assets in its name to comply with the express instructions of the plan administrator, see Pl. Op. Mem. WHX at 2 n.1, we reject that argument as well.  The mere act of providing the authorization needed to effectuate the instructions of the plan administrator does not reflect that WHX "exercise[d] authority or control" over the management or disposition of assets within any ordinary meaning of that phrase.[9]

---

[9]  The only case cited by plaintiffs in support of their argument, F.W. Webb Co. v. State St. Bank & Trust Co., 2010 WL 3219284 (S.D.N.Y. Aug. 12, 2010), is not to the contrary.  In

B.      Claim Brought Pursuant to ERISA Section 502(a)(3) (Count III)

Plaintiffs have also sued WHX pursuant to ERISA section 502(a)(3), 29 U.S.C.

§ 1132(a)(3), alleging that even if WHX is deemed a non-fiduciary, it violated ERISA by

knowingly participating in a fiduciary's breach.  2d Am. Compl. ¶¶ 122-27.  ERISA section

502(a)(3), 29 U.S.C. § 1132(a)(3) provides that

> a civil action may be brought[] by a participant, beneficiary, or fiduciary: A) to
> enjoin any act or practice which violates any provision of this subchapter or the
> terms of the plan, or (B) to obtain other appropriate equitable relief (I) to redress
> such violations or (ii) to enforce any provisions of this subchapter or the terms of
> the plan . . .

Id.  Thus, the statute limits the relief that may be obtained against a non-fiduciary to only

injunctive or "other appropriate equitable relief," which the Supreme Court has held does not

include "'awards for compensatory or punitive damages.'"  Mertens v. Hewitt Assocs., 508 U.S.

248, 255 (1993) (quoting United States v. Burke, 504 U.S. 229, 238 (1992)).  Instead, "[r]elief

under section 502(a)(3) is limited to 'those categories of relief that were typically available in

equity.'"  In re Pfizer Inc. ERISA Litig., 2009 WL 749545, at *16 (S.D.N.Y. Mar. 20, 2009)

(quoting Mertens, 508 U.S. at 256); Great-W. Life & Annuity Ins. Co. v. Knudson, 534 U.S.

204, 210 (2002) (citations omitted).  As a result, "non-fiduciaries who knowingly participate in a

fiduciary breach cannot be liable for ordinary money damages."  Gerosa v. Savasta & Co., 329

───────────────────────

that case, the court found that the fact that an administrative service provider to a plan gave the
plan a limited range of options from which participants in a plan could invest did not by itself
make the provider a fiduciary under the statute.  In its discussion of the applicable law, the court
included a statement in dictum that a fiduciary relationship exists if the provider "handles the
assets according to instructions that others gave him," id. at *5 (citations omitted).  But in that
case, the provider limited the range of instructions that the plan participants could confer on the
provider.  Thus, the provider potentially made itself a fiduciary by imposing limitations on the
plan participants as to what instructions they could give it.  Hence, the court's reference to the
disposition of assets "according to instructions" had a significance in F.W. Webb Co. that does
not exist in the instant case.

F.3d 317, 322 (2d Cir.) (citing <u>Mertens</u>, 508 U.S. at 255 (1993)), <u>cert. denied</u>, 540 U.S. 967

(2003); <u>see</u> <u>Krauss v. Oxford Health Plans, Inc.</u>, 517 F.3d 614, 630 (2d Cir. 2008) ("Claims for

money damages are . . . not cognizable under section 502(a)(3)"); <u>accord</u> <u>Structural Maint. &</u>

<u>Contracting Co. v. Jayce Enters., Inc.</u>, 2010 WL 4159517, at *6 (S.D.N.Y. Oct. 12, 2010).

     The complaint here seeks recovery from WHX of the plaintiffs' losses, 2d. Am. Compl.

at 34-35, which is plainly tantamount to a request for damages and thus falls outside the statute.

<u>See</u>, <u>e.g.</u>, <u>Great-W. Life & Annuity Ins. Co.</u>, 534 U.S. at 210 ("[S]uits seeking (whether by

judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the

plaintiff are suits for 'money damages,' as that phrase has traditionally been applied, since they

seek no more than compensation for loss resulting from the defendant's breach of legal duty.")

(citation omitted); <u>accord</u> <u>Kendall v. Emps. Ret. Plan of Avon Prods.</u>, 561 F.3d 112, 119 (2d Cir.

2009); <u>Coan v. Kaufman</u>, 457 F.3d 250, 263 (2d Cir. 2006).  Indeed, plaintiffs concede as much,

Pl. Op. Mem. WHX at 16, and argue instead that because the complaint also prays "for any

further relief which the Court deems to be just and appropriate," 2d. Am. Compl. at 35 ¶ F, they

have sought equitable relief against WHX, <u>see</u> Pl. Op. Mem. WHX at 16.  This clause, however,

is content-less, and plainly cannot be construed to seek any particular injunctive or equitable

relief.  <u>See</u> <u>West v. AK Steel Corp. Ret. Accumulation Pension Plan</u>, 484 F.3d 395, 403 (6th Cir.

2007) ("request [for] unspecified other relief as may be deemed just and

equitable . . . insufficient to assert a proper equitable claim under § 502(a)(3) where the 'heart of

the plaintiff's prayer for relief was a request for recovery of additional lump sum benefits'")

(quoting <u>Crosby v. Bowater, Inc. Ret. Plan</u>, 382 F.3d 587, 589 (6th Cir. 2004), <u>cert. denied</u>, 544

U.S. 976 (2005)), <u>cert. denied</u>, 129 S. Ct. 895 (2009); <u>Thomas v. Kimberly-Clark Corp.</u>, 2008

WL 4977762, at *3 (E.D. Pa, Nov. 20, 2008) (plaintiff's request for "other relief as this

Honorable Court deems just and proper" was insufficient to state a claim pursuant to ERISA

§ 502(a)(3)) (citing cases); Cook v. Campbell, 482 F. Supp. 2d 1341, 1360 (M.D. Ala. 2007)

(request for "such other and further relief as this Court deems appropriate" does not permit claim

under § 502(a)(3)(B)); Strohmeyer v. Metro. Life Ins. Co., 2005 WL 3963770, at *3 (D. Conn.

Nov. 15, 2005) (plaintiff failed to state a claim for equitable relief under section 502(a)(3)

despite the fact that plaintiff's complaint sought "'any and all further relief that [the court]

deem[ed] fair and equitable'"); Kishter v. Principal Life Ins. Co.,186 F. Supp. 2d 439, 446

(S.D.N.Y. 2002) (plaintiff's request for "such other . . . equitable relief as the Court deems

appropriate" insufficient to state claim pursuant section 502(a)(3)).  Nor do plaintiffs' motion

papers even suggest what sort of injunctive or equitable relief would be supported by the

allegations of the complaint.  See, e.g., Young v. Reconstructive Orthopaedic Assocs., II, P.C., et

al., 2005 WL 627796, at *15 (E.D. Pa. Mar. 16, 2005) (claim barred under ERISA § 502(a)(3)

where, inter alia, "plaintiff does not suggest . . . an equitable remedy appropriate").

Accordingly, plaintiffs' claim under ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3), is

dismissed.

V.      CONCLUSION

        For the foregoing reasons, WHX's motion to dismiss (Docket # 59) is granted and WPN

and LaBow's motion to dismiss (Docket # 51) is granted in part and denied in part.

Dated:  September 1, 2011
        New York, New York

                                                GABRIEL W. GORENSTEIN
                                                United States Magistrate Judge

28