UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SEVERSTAL WHEELING INC., et al.,                            :

                 Plaintiffs,                                 : 10 Civ. 954 (LTS) (GWG)

   -v.-                                                          : <u>REPORT AND RECOMMENDATION</u>

WPN CORPORATION, et al.,                                    :

                Defendants.                               :

-----------------------------------------------------------------X
**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Plaintiffs Severstal Wheeling, Inc. Retirement Committee ("SRC"), Timothy S. Rogers,

Richard Caruso, and William Drew Landon brought this suit against WPN Corporation

("WPN"); its principal, Ronald LaBow (together, "defendants"); and WHX Corporation

("WHX") pursuant to the Employment Retirement and Income Security Act ("ERISA"), 29

U.S.C. §§ 1001-1169, and state law.  WHX was later dismissed from the case.  LaBow has been

sued both in his individual capacity and as a named fiduciary of the Wheeling Corrugating

Company Retirement Security Plan of Severstal Wheeling, Inc. (the "Wheeling Corrugating

Plan") and the Salaried Employees' Pension Plan of Severstal Wheeling, Inc. (the "Salaried

Employees Plan").  Plaintiffs have moved for partial summary judgment pursuant to Federal

Rule of Civil Procedure 56 on the following issues: (1) that LaBow and WPN were fiduciaries of

the Wheeling Corrugating Plan and the Salaried Employees Plan (collectively, "the Severstal

Plans"); (2) that LaBow and WPN's fiduciary status was co-extensive; and (3) that WPN

breached its contractual obligation to acquire fiduciary liability insurance for the Severstal

1

Plans.[1]  For the following reasons, plaintiffs' motion should be granted in part and denied in part.

I.      BACKGROUND

        A.      Facts

        The following facts are undisputed unless otherwise stated.

        Severstal Wheeling, Inc ("SWI") is a corporation that produces and manufactures sheet steel and steel-coated products.  See Third Amended Complaint, filed May 10, 2013 (Docket # 184) ("3d Am. Compl.") ¶ 23.[2]  "The corporate predecessor of [SWI] was Wheeling-Pittsburgh Steel Corporation.  Prior to August 1, 2003, Wheeling-Pittsburgh Steel Corporation was a wholly-owned subsidiary of Wheeling-Pittsburgh Corporation, which, in turn, was a wholly-owned subsidiary of WHX . . . ."  Id. ¶ 24.  "On August 1, 2003, after a period in bankruptcy,

_____

        [1] See Notice of Motion and Motion for Partial Summary Judgment, filed May 30, 2013 (Docket # 188) ("Not. Mot."); Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment, filed May 30, 2013 (Docket # 189) ("Pl. Mem."); Plaintiffs' Local Civil Rule 56.1 Statement of Undisputed Material Facts, filed May 30, 2013 (Docket # 190) ("Pl. 56.1 Statement"); Declaration of Monya M. Bunch in Support of Plaintiffs' Motion for Partial Summary Judgment, filed May 30, 2013 (Docket # 191) ("Bunch Decl."); Declaration of Ronald LaBow in Opposition to Motion for Partial Summary Judgment, filed June 27, 2013 (Docket # 193) ("LaBow Decl."); Declaration of Daniel Cobrinik in Opposition to Motion for Partial Summary Judgment, filed June 27, 2013 (Docket # 196) ("Cobrinik Decl."); Defendants' Statement of Disputed Material Facts Pursuant to Local Civil Rule 56.1, filed July 1, 2013 (Docket # 197) ("Def. 56.1 Statement"); Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment, filed July 1, 2013 (Docket # 198) ("Def. Mem."); Reply Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment, filed July 19, 2013 (Docket # 199) ("Pl. Reply"); Second Declaration of Monya M. Bunch in Support of Plaintiffs' Motion for Partial Summary Judgment, filed July 19, 2013 (Docket # 200); Plaintiffs' Objections to Defendants' Additional Factual Statements, filed July 19, 2013 (Docket # 201); Declaration of Dennis Halpin in Support of Plaintiffs' Motion for Partial Summary Judgment, filed July 19, 2013 (Docket # 202); Declaration of Michael DiClemente in Support of Plaintiffs' Motion for Partial Summary Judgment, filed July 19, 2013 (Docket # 203) ("DiClemente Decl.").

        [2] Where we cite to the complaint, we do so only to provide background information and not as evidence to support either side in this summary judgment motion.

Wheeling-Pittsburgh Corporation became an independently traded public company and was no longer owned by [WHX]." Id. ¶ 26.  On November 27, 2007, Wheeling-Pittsburgh Corporation combined with Esmark Steel Service Group to form Esmark Incorporated.  Id. ¶ 27.  "As a result of this business combination, Esmark Incorporated was renamed Severstal Wheeling Holding Company, Wheeling-Pittsburgh Corporation was renamed Severstal Wheeling Steel Group, Inc.," and Wheeling-Pittsburgh Steel Corporation became SWI.  Id. ¶ 28.

SWI operates and is the sponsor of three retirement plans: the Wheeling Corrugating Plan, a defined contribution plan regulated by ERISA; the Salaried Employees Plan, also a defined contribution plan regulated by ERISA; and the Severstal Wheeling, Inc. Pension Plan (also known as the "DB Plan"), a defined benefit plan regulated by ERISA.  Id. ¶¶ 8-11.  "All three plans are 'employee benefit pension plans' within the meaning of ERISA Section 3(2)(A), 29 U.S.C. § 1002(2)(A)."  Id. ¶ 8.

Until late 2008, the Severstal Plans, including the Wheeling Corrugating Plan and the Salaried Employees Plan, were funded and maintained through a trust sponsored by WHX ("the WHX Master Trust").  Pl. 56.1 Statement ¶ 1; Declaration of Richard E. Bowness, dated Nov. 17, 2011 (annexed as Ex. C to Bunch Decl.) ("Bowness Decl.") ¶¶ 3-4.[3]  In February 2004, WHX entered into an investment agreement with WPN, under which WPN was charged with giving investment advice for the WHX Master Trust (the "WHX Investment Agreement").  See Pl. 56.1 Statement ¶ 8; Deposition of Ronald LaBow (annexed as Ex. E to Bunch Decl.)

_____

[3]  Unless otherwise noted, we cite to plaintiffs' Local Civil Rule 56.1 statement only where defendants have not controverted the cited statement.  See Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.").

("LaBow Dep."), at 65-67.  The WHX Investment Agreement stated that WPN would have "complete, unlimited, and unrestricted management authority" with respect to the investment of the WHX Master Trust.  Pl. 56.1 Statement ¶ 10; WHX Corporation Investment Consulting Agreement (annexed as Ex. 2 to LaBow Dep.) ("WHX Agreement") ¶ 7.

Ronald LaBow was the President of WPN from January 2006 through December 2009. Pl. 56.1 Statement ¶ 6; LaBow Interrogatory (annexed as Ex. 8 to LaBow Dep.) ("LaBow Inter."), at 1.  During this time, LaBow was the only executive of WPN with responsibility for investment management.  Pl. 56.1 Statement ¶ 7; LaBow Inter. at 1.  In early 2008, WHX and WPN executed a "Second Amendment" to the WHX Investment Agreement which stated that WPN would continue to have "complete, unlimited, and unrestricted management authority" with respect to the investment of the WHX Master Trust and that "LaBow has the primary responsibility for performing the services of the Manager with respect to" the WHX Master Trust.  Pl. 56.1 Statement ¶¶ 9-10; Second Amendment (annexed as Ex. 4 to LaBow Dep.) ("2d Am.") ¶ 2, 7.  In both the WHX Investment Agreement and the Second Amendment, WPN specifically acknowledged that it would be acting as an ERISA "fiduciary" with respect to the management of the WHX Master Trust.  Pl. 56.1 Statement ¶ 12; WHX Agreement ¶¶ 4,7; 2d Am. ¶ 11.

Citibank, N.A. ("Citibank") originally served as trustee and custodian of the WHX Master Trust, but Citibank announced that it would be leaving the trust business in 2008.  See Pl. 56.1 Statement ¶ 2; LaBow Dep. at 46; Robert Hynes Letter, dated June 28, 2008 (annexed as Ex. 38 to Deposition of Dennis Halpin (annexed as Ex. G to Bunch Decl.) ("Halpin Dep.")) ("June 28 Letter").  As a result of this announcement, it was decided in September 2008 that the Severstal Plans' assets would be transferred from the WHX Master Trust to a new and separate

4

trust called the Severstal Wheeling, Inc. Pension Plan Trust ("Severstal Trust").  Pl. 56.1

Statement ¶ 3; LaBow Dep. at 125; June 28 Letter.  Sometime before the transfer of the Severstal

Plans, LaBow discussed the transfer with the SRC.  Pl. 56.1 Statement ¶ 15; LaBow Letter to

SRC, dated Oct. 22, 2008 (annexed as Ex. 14. to LaBow Dep.) ("October 22 Letter").  On

October 22, 2008, LaBow informed Michael DiClemente, a member of the SRC, that, "[o]n

November 3, 2008," he "intend[ed] to direct the transfer of most of the assets of the [Severstal]

Trust, with the balance to be transferred after Citibank, N.A. issues its October 31, 2008 report

for the trust."  Pl. 56.1 Statement ¶ 29; October 22 Letter.  On October 31, 2008, LaBow emailed

WHX employee David Riposo with a request to "transfer the entire" contents of a particular

account at WHX Master Trust, known as the Neuberger Berman Account, to "Severstal

Wheeling" and that the transfer should take place "prior to market opening on Nov 3, 2008."  Pl.

56.1 Statement ¶ 30; LaBow Email to Riposo, dated Oct. 31, 2008 (annexed as Ex. 37 to LaBow

Dep.) ("October 31 Email").  On November 3, 2008, Riposo sent a letter to Citibank directing it

to transfer the Severstal Plans assets from the WHX Master Trust to the Severstal Trust before

market opening that day.  Pl. 56.1 Statement ¶ 31; Riposo SWI Asset Transfer Email, dated Nov.

3, 2008 (annexed as Ex. 44 to LaBow Dep.).  Citibank transferred the assets as directed on that

day.  Pl. 56.1 Statement ¶ 32; WHX Pension Transfer Record, dated Nov. 3, 2008 (annexed as

Ex. A to Declaration of Andrew Quesnelle (annexed as Ex. H to Bunch Decl.)).  As is described

further in section III.A.1 below, defendants have asserted that WPN and LaBow had no authority

themselves to transfer the Severstal Plans assets to the Severstal Trust, see Defendants'

Additional Factual Statements, filed July 1, 2013 (Docket # 197) ("Def. 56.1 Add. Facts") ¶ 6;

Declaration of Richard E. Bowness, dated June 10, 2013 (annexed as Ex. 3 to Cobrinik Decl.)

("2d Bowness Decl.") ¶ 3, and that plaintiffs and WHX were, in fact, the parties who directed the

transfer, see Def. 56.1 Add. Facts ¶ 7; Deposition of Glen Kassan (annexed as Ex. 7 to Cobrinik

Decl.) ("Kassan Dep."), at 36-38.

On December 5, 2008, LaBow and DiClemente signed a "Third Amendment" to the

original WHX Investment Agreement between WPN and SWI.  Pl. 56.1 Statement ¶ 16;

Deposition of Michael DiClemente (annexed as Ex. F to Bunch Decl. and as Ex. 2 to Cobrinik

Decl.) ("DiClemente Dep."), at 193; Third Amendment (annexed as Ex. 1 to Cobrinik Decl.)

("3d Am.").  Defendants assert that prior to this date there was no agreement between SWI and

defendants as to whether defendants would continue to have any responsibilities managing the

Severstal Trust.  See Def. 56.1 Add. Facts ¶¶ 14-15; DiClemente Dep. at 77-78.  Additionally,

defendants claim that prior to this date there was no agreement requiring plaintiffs to pay

defendants for managing the Severstal Trust.  See Def. 56.1 Add. Facts ¶ 16; LaBow Decl. ¶ 43.

Notwithstanding this dispute, the text of the Third Amendment provides that it is

"effective November 1, 2008."  See 3d Am. at 1.  It further recites that "the parties have

executed this amendment as of" November 1, 2008.  Id. at 8.  The Third Amendment states that

"Ron LaBow has the primary responsibility for performing the services of [WPN] with respect

to the Investment Fund."  Id. ¶ 2.  It also incorporates paragraph 7 of the original WHX

Investment Agreement, granting WPN and LaBow "complete, unlimited, and unrestricted

management authority with respect to the investment of the Investment Fund."  See id. ¶ 10.

The Third Amendment provides that LaBow would be paid a fee for his services in managing the

investment fund pursuant to the agreement.  See id. ¶ 9.  LaBow has asserted that he was entitled

to receive such fees for his work in November and December 2008 but that he offered to waive

those fees.  Pl. 56.1 Statement ¶ 42; Letter to Sally King, dated Jan. 12, 2009 (annexed as Ex. 59

to LaBow Dep.).  The Third Amendment contains a provision in which WPN acknowledges that

it is a "fiduciary" under ERISA.  3d Am. ¶ 2 (substituting a new section 3(n)).  The Third

Amendment also kept the previous requirement that WPN "obtain and maintain in effect a

fiduciary liability insurance policy or policies for the benefit of" the Severstal Plans.  See 3d

Am. ¶ 10 (incorporating 2d Am. ¶ 8).

On January 20, 2009, DiClemente instructed LaBow to prepare a written plan on how to

reallocate the Severstal Trust assets.  Pl. 56.1 Statement ¶ 48; Letter on Reallocation of Assets

from WHX Master Trust, dated Jan. 20, 2009 (annexed as Ex. 61 to LaBow Dep.).  On March

23, 2009, LaBow left a voicemail message for SRC member Dennis Halpin, in which LaBow

accepted responsibility for not previously diversifying the Severstal Plans assets and expressed

his desire to diversify the assets.  Pl. 56.1 Statement ¶ 54; LaBow Voicemail Message to Halpin,

dated Mar. 23, 2009 (annexed as Ex. 78 to LaBow Dep.) ("LaBow March 23 Halpin

Voicemail").  That same day, LaBow left a voicemail message for Sally King, an attorney for the

SRC, letting her know that he intended to diversify the assets.  Pl. 56.1 Statement ¶ 55; LaBow

Voicemail Message to King, dated Mar. 23, 2009 (annexed as Ex. 79 to LaBow Dep.) ("LaBow

March 23 King Voicemail").  The following day, the Severstal Plans' assets were liquidated.

See Pl. 56.1 Statement ¶ 56; DiClemente Dep. at 125.  LaBow continued to discuss the

investment of the Severstal Trust with the SRC after March 2009.  Pl. 56.1 Statement ¶ 58;

LaBow Letter to SRC Chair Vincent Assetta, dated May 20, 2009 (annexed as Ex. 84 to LaBow

Dep.).  On May 19, 2009, the SRC terminated WPN and LaBow's position as investment

manager for the Severstal Plans.  Pl. 56.1 Statement ¶ 60; Termination Notice, dated May 19,

2009 (annexed as Ex. 82 to LaBow Dep.).

B.    Procedural History

Plaintiffs filed their original complaint on February 5, 2010, see Complaint, filed Feb. 5, 2010 (Docket # 1), alleging claims against only WPN and LaBow, see id.  Plaintiffs filed an amended complaint on May 7, 2010, see Amended Complaint, filed May, 7, 2010 (Docket # 29), and upon securing leave from the Court, see Order, filed Nov. 9, 2010 (Docket # 47), filed a second amended complaint on November 15, 2010, see Second Amended Complaint, filed Nov. 15, 2010 (Docket # 48).  The second amended complaint added claims against WHX.  See id. On January 5, 2011, LaBow and WPN filed a motion to dismiss the second amended complaint pursuant to Federal Rule of Civil Procedure Rule 12(b)(6).  See Notice of Motion by Defendants WPN Corporation and Ronald LaBow to Dismiss the Second Amended Complaint, filed Jan. 5, 2011 (Docket # 51).  On January 19, 2011, WHX also filed a motion to dismiss the second amended complaint.  See Notice of Motion by Defendant WHX Corporation to Dismiss the Second Amended Complaint, filed Jan. 19, 2011 (Docket # 59).   On September 1, 2011, the Court granted WHX's motion to dismiss and denied LaBow and WPN's motion to dismiss.  See Severstal Wheeling Inc. v. WPN Corp., 809 F. Supp. 2d 245 (S.D.N.Y. 2011) ("Severstal I"). Specifically, Severstal I found that the second amended complaint stated breach of loyalty claims against WPN and LaBow for their conduct as ERISA fiduciaries, see id. at 255, but that it failed to state such a claim against WHX because WHX did not act as an ERISA fiduciary, see id. at 261.

Shortly thereafter, LaBow and WPN filed a motion for summary judgment.  See Notice of Cross-Motion, filed Sept. 29, 2011 (Docket # 80).  On September 25, 2012, the Court issued a memorandum order, denying the motion.  See Severstal Wheeling, Inc. v. WPN Corp., 2012 WL 3561243 (S.D.N.Y. Aug 17, 2012) ("Severstal II").  In relevant part, the Court found that there

was a genuine dispute of material fact on the issue of whether LaBow and WPN breached their

fiduciary duty by directing the transfer of the Severstal Plan assets and for failing to diversify the

assets.  Id., at *6.  Following this decision, on May 10, 2013, plaintiffs filed a third amended

complaint, which we refer to as "the complaint."  See 3d Am. Compl.  It names WPN, LaBow,

and WHX as defendants and alleges the following claims for relief: (1) breach of fiduciary duty

under section 502(a)(2) of ERISA by failing to loyally manage plan assets in violation of ERISA

sections 404(a)(1)(A) and 406(b) against all defendants; (2) breach of fiduciary duty under

section 502(a)(2) of ERISA by failing to adequately diversify plan assets in violation of ERISA

section 404(a)(1)(c) against all defendants; (3) knowing participation of a fiduciary breach by a

non-fiduciary under section 502(a)(3) of ERISA against WHX; (4) and a breach of contract

claim against WPN.  See id. ¶¶ 96-125.

On May 30, 2013, plaintiffs filed the instant motion seeking partial summary judgment

on three issues: "(1) that Defendants Ronald LaBow and WPN Corp. were fiduciaries of the

[Severstal Plans] pursuant to ERISA § 3(21)(A)(ii) [29 U.S.C. § 1002(21)(A)(ii)] and 29 C.F.R.

§ 2510.3-21(c)(i) & (ii)(A)-(B) [sic]; (2) that Defendants' fiduciary status was co-extensive; and

(3) that WPN breached its contractual obligation to acquire fiduciary liability insurance for the

Severstal Plans' benefit."  See Not. Mot.  While it is not mentioned in their Notice of Motion,

plaintiffs' brief makes clear that plaintiffs also seek partial summary judgment on the issue of

whether LaBow and WPN were fiduciaries under ERISA § 3(21)(A)(i), that is, 29 U.S.C.

§ 1002(21)(A)(i).  See Pl. Mem. at  6-8.

II.   APPLICABLE LAW

Rule 56(a) of the Federal Rules of Civil Procedure states that summary judgment is

appropriate when "the movant shows that there is no genuine dispute as to any material fact."

Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, "[t]he evidence of the non-movant is to be believed" and the court must draw "all justifiable inferences" in favor of the nonmoving party. Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial,'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis in original) (additional citation omitted) (quoting Fed. R. Civ. P. 56(e)), and "may not rely on conclusory allegations or unsubstantiated speculation," Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (citations omitted). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." Anderson, 477 U.S. at 256.

Under Rule 56(a) of the Federal Rules of Civil Procedure, a party has the option to move for summary judgment on "part of [a] claim or defense." In other words, Rule 56(a) "authorizes partial summary judgment that falls short of a final determination to limit the issues to be determined at trial." In re Ciprofloxacin Hydrochloride Antitrust Litig., 261 F. Supp. 2d 188, 231 (E.D.N.Y. 2003); see also Martinez v. Hilton Hotels Corp., 930 F. Supp. 2d 508, 518 (S.D.N.Y. 2013).

10

III.     DISCUSSION

A.      WPN and LaBow's ERISA Fiduciary Status

Plaintiffs seek summary judgment on the issue of whether LaBow and WPN were

fiduciaries to the Severstal Plans at all times relevant to plaintiffs' claims.  They point to two

separate provision of ERISA as demonstrating LaBow and WPN's fiduciary status: 29 U.S.C.

§§ 1002(21)(A)(i) and (ii).[4]

Under section 1002(21)(A)(i), a person is considered a fiduciary with respect to an

ERISA plan to the extent that "he exercises any discretionary authority or discretionary control

respecting management of such plan or exercises any authority or control respecting

management or disposition of its assets."  A person is an ERISA fiduciary under section

1002(21)(A)(ii) if "he renders investment advice for a fee or other compensation, direct or

indirect, with respect to any moneys or other property of such plan, or has any authority or

responsibility to do so."  As this Court has recognized,

> ERISA's definition of fiduciary is "to be broadly construed," and "[u]nlike the
> common law definition of fiduciary, which rests 'on the position a person holds,'
> ERISA's definition of fiduciary rests on the function a person plays."  Finkel v.
> Union Elevator Corp., 2011 WL 1655573, at *2 (E.D.N.Y. May 2, 2011); see
> LoPresti v. Terwilliger, 126 F.3d 34, 40 (2d Cir. 1997) (citations omitted).

Severstal I, 809 F. Supp. 2d at 260; see also Severstal II, 2012 WL 3561243, at *5 (fiduciary

duty under ERISA is to be "broadly construed") (quoting LoPresti v. Terwilliger, 126 F.3d at

40); District 65, UAW v. Harper & Row, Publishers, Inc., 670 F. Supp. 550, 555 (S.D.N.Y.

1987) ("Congress' intention was to spread a broad protective net of fiduciary responsibility.").

Case law makes clear that the concept of "fiduciary" does not exist in a vacuum.  To the

---

[4]  Plaintiffs do not assert that defendants come within 29 U.S.C. § 1002(21)(A)(iii).

11

contrary, it is settled that "a person may be an ERISA fiduciary with respect to certain matters but not others, for he has that status only to the extent that he has or exercises the described authority or responsibility." F.H. Krear & Co. v. Nineteen Named Trs., 810 F.2d 1250, 1259 (2d Cir. 1987) (internal quotation marks omitted); accord Bell v. Pfizer, Inc., 626 F.3d 66, 74 (2d Cir. 2010); Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co., 302 F.3d 18, 28 (2d Cir. 2002); Severstal I, 809 F. Supp. 2d at 260; Gray v. Briggs, 45 F. Supp. 2d 316, 328 (S.D.N.Y. 1999). "Thus, when considering the fiduciary status of the various defendants listed in a complaint, the court must not only consider the plan documents and general allegations of fiduciary responsibility, but the particular context in which a fiduciary is named or a defendant is alleged to exercise discretionary responsibility." Smith v. Stockwell Const. Co., Inc., 2011 WL 6208697, at *5 (W.D.N.Y. Dec. 14, 2011) (emphasis added and internal quotation marks omitted) (quoting In re Marsh ERISA Litig., 2006 WL 3706169, at *5 (S.D.N.Y. Dec. 14, 2006)).

As noted in Severstal I, some case law has stated that fiduciary status under ERISA can arise not only through the performance of fiduciary functions but also "from being named as a fiduciary in plan documents." Severstal I, 809 F. Supp. 2d at 260 (quoting In re Pfizer Inc. ERISA Litig., 2009 WL 749545, at *6 (S.D.N.Y. Mar. 20, 2009); accord In re Lehman Bros. Secs. & ERISA Litig., 683 F. Supp. 2d 294, 298 (S.D.N.Y. 2010). The origin of this phrase appears to derive from a Ninth Circuit case called Concha v. London, 62 F.3d 1493, 1501-02 (9th Cir. 1995). See In re Polaroid ERISA Litigation, 362 F. Supp. 2d 461, 473 (S.D.N.Y. 2005) (citing Concha). But Concha does not hold that being named as a fiduciary in plan documents is sufficient to create liability in the absence of the named individual's actual performance of any fiduciary functions. Accordingly, we do not conclude that being named in the documents is

12

sufficient for liability under the statute.  Nor do plaintiffs so argue.

Because sections 1002(21)(A)(i) and (ii) provide alternate grounds upon which a person can be found to be a fiduciary with respect to an ERISA plan, see Bouboulis v. Transp. Workers Union of Am., 442 F.3d 55, 62 (2d Cir. 2006) (noting that "§ 1002(21)(A) creates a bifurcated test"), plaintiff need only show that WPN and LaBow qualify as fiduciaries under one of the provisions. We discuss each provision separately.

      1. Section 1002(21)(A)(i)

On the question of whether WPN and LaBow would qualify as fiduciaries under section 1002(21)(A)(i), the parties dispute whether WPN and LaBow "exercise[d] any discretionary authority or discretionary control respecting management of" the Severstal Plans within the meaning of that section.  If the answer to this question were to be resolved by means of the written documents alone, we would have to find in plaintiffs' favor, as the WHX Investment Agreement granted WPN "complete, unlimited, and unrestricted management authority" with respect to the investment of the Severstal Plans assets.  WHX Agreement ¶ 7.  Similarly, the Second Amendment to the WHX Investment Agreement gave LaBow "primary responsibility for performing the services of the Manager with respect to" the Severstal Plans.  See 2d Am. ¶ 2; accord 3d Am. ¶ 2.

However, defendants have presented evidence that, despite the language of these provisions, LaBow and WPN did not have any authority or control over management of the plans with respect to any of the transactions raised in the complaint.  They assert that, in practice, defendants had no authority to direct the transfer of WHX Pension Trust assets to the SWI Plans and that they did not, in fact, do so.  See Def. Mem. at 11.  Instead, they point to evidence suggesting that their authority over the Severstal Plans assets was limited to proposing

advice as to management of the plans and, even then, only in certain respects.  See Def. 56.1 Add. Facts ¶¶ 6, 22; Def. Mem. at 12-16; LaBow Decl. ¶ 76.

It is true that a person need not have absolute control or authority over an ERISA plan's assets in order to qualify as a fiduciary under section 1002(21)(A)(i).  See Am. Med. Ass'n v. United HealthCare Corp., 2007 WL 1771498, at *23 (S.D.N.Y. June 18, 2007) (citing Blatt v. Marshall & Lassman, 812 F.2d 810, 812 (2d Cir. 1987)); accord Toussaint v. JJ Weiser & Co., 2005 WL 356834, at *7 (S.D.N.Y. Feb. 13, 2005).  Nevertheless, section 1002(21)(A)(i) requires that the alleged fiduciary exercises at least some degree of discretionary authority or discretionary control and is not simply performing "ministerial functions."  See Am. Med. Ass'n, 2007 WL 1771498, at *23.

Because fiduciary status does not exist in a vacuum, see, e.g., In re Celotex Corp., 497 F. App'x 896, 900 n. 1 (11th Cir. 2012) (citing Restatement (Second) of Trusts § 2(b) (1959)), the question in this case is not simply a binary choice between whether the defendants were fiduciaries or not.  Instead, we must determine whether the defendants acted as fiduciaries with respect to a particular transaction or event at issue.  Thus, before analyzing defendants' fiduciary status, we first review plaintiffs' complaint to identify the relevant transactions upon which plaintiffs base their claims against defendants.  The complaint may be characterized as complaining about (1) the November 3, 2008 transfer and (2) events occurring after the November 3, 2008 transfer.  We discuss each separately.

a.  The November 3, 2008 Transfer.  In Count I of their complaint, plaintiffs allege that defendants breached their fiduciary duty with regard to the transfer of the Severstal Plans assets on November 3, 2008, because defendants "fail[ed] to disclose Defendant LaBow's previous relationship and dealings with Neuberger Berman."  See 3d Am. Compl. ¶¶ 97-99.  Accordingly,

14

we turn to the question of whether, at the time of this transfer, defendants had sufficient

authority or control over the Severstal Plans assets to be treated as fiduciaries.

     To support the conclusion that defendants had such authority or control, plaintiffs point

to documents suggesting that LaBow selected which assets would be transferred to the Severstal

Trust and that he, in fact, executed the transfer.  See Pl. Mem. at 7.  For example, in an October

22, 2008, letter to DiClemente, LaBow wrote, "I intend to direct the transfer of most of the assets

of the plans to the [Severstal] Trust," see October 22 Letter, and in an October 31, 2008, email to

David Riposo, Labow wrote, "pls transfer the entire Neuberger&Berman a/c to Severstal

Wheeling prior to market opening on Nov 3, 2008," see October 31 Email.  Furthermore, in a

letter to the SRC that post-dates the transfer, LaBow appears to take responsibility for the

transfer of the assets, saying, "I felt I had no other option given market conditions and the

previous decline in energy shares to transfer the entire Neuberger Berman account . . . ."

LaBow's Post-Transfer Letter to the SRC, dated Feb. 4, 2009 (annexed as Ex. 39 to  DiClemente

Dep.).  Additionally, LaBow has admitted to giving the instruction for the transfer of the

Severstal Plans assets.  See LaBow Dep. at 307-08.  Plaintiffs also highlight the fact that the

Third Amendment purported to give WPN and LaBow "complete, unlimited, and unrestricted

management authority with respect to the investment of the Investment Fund," 3d. Am. ¶ 10

(incorporating WHX Agreement ¶ 7), and "sole discretion, to select one or more brokers and/or

dealers through whom all transactions for the Investment Fund shall be executed," id.

(incorporating WHX Agreement ¶ 6).   Finally, they point to Judge Swain's prior ruling in this

case, in which she acknowledged that plaintiffs "presented numerous pieces of evidence in

support of their claim that Defendants actually exercised their investment authority by directing

the transfer."  See Pl. Mem. at 6 (quoting Severstal II, 2012 WL 3561243, at *5) (finding that

"Plaintiffs have presented ample evidence from which a reasonable jury could conclude that Defendants were fiduciaries of the Trust as of the November 3 transfer"). In plaintiffs' view, this evidence shows that there is "no genuine dispute of material fact that Defendants were fiduciaries under [29 U.S.C. § 1002(21)(A)(i)] with respect to the transfer of the assets on November 3, 2008 as a result of their exercise of authority and control of the Severstal Plans' assets in the transfer." Pl. Mem. at 8.

Notwithstanding the evidence that plaintiffs have put forward suggesting that LaBow and WPN exercised actual authority and control over the Severstal Plans at the time of the transfer of the assets to the Severstal Trust on November 3, 2008, the defendants have presented significant evidence to the contrary. See Def. 56.1 Add. Facts ¶ 6. For example, a former member of the SRC named Richard Bowness provided a sworn declaration in which he testified that "it has always been my understanding that [an instruction to transfer plan assets] could not have come from Mr. LaBow and WPN Corp. because they had no authority to direct any transfer of assets from the WHX Pension Plan Trust. Only the WHX Retirement Committee could have directed this transfer." 2d Bowness Decl. ¶ 3. Additionally, SRC member Michael DiClemente testified that he was not aware of any role that LaBow or WPN played in directing the Severstal Plans assets to be transferred into the Severstal Trust. DiClemente Dep. at 130-31. Nancy Kronenberg, the Citibank officer responsible for the Severstal Plans, testified: "Basically we could not take direction from Mr. LaBow. Any type of direction would have to come through WHX." Deposition of Nancy Kronenberg (annexed as Ex. 4 to Cobrinik Decl.) ("Kronenberg Dep."), at 10-11. In his sworn declaration, LaBow explains that he and WPN could not direct investment of the Severstal Plans assets because plaintiffs never instructed the trustees of the Severstal Plans (Citibank and then National City) to comply with WPN and LaBow's requests.

16

See LaBow Decl. ¶¶ 44-45 (explaining that, pursuant to the Third Amendment, this instruction

was required to trigger defendants' management authority).  Because the trustees were not

notified of LaBow's authority, Kronenberg considered LaBow to be a "stranger" and refused to

discuss the investment of the Severstal account with him.  Id. ¶ 46.

Defendants also provided deposition testimony from WHX Treasurer James McCabe,

WHX employee David Riposo, and WHX Pension Investment Committee Chairman Glen

Kassan, to buttress their assertion that LaBow and WPN did not have the authority to direct the

transfer of the Severstal Plans assets to the Severstal Trust.  See Deposition of James McCabe

(annexed as Ex. 5 to Cobrinik Decl.), at 55-56 (testifying that he did not think that LaBow could

have directed a transfer of assets from the WHX Pension Trust to the Severstal Pension Trust

without a direction letter from other authorized individuals); Deposition of David Riposo

(annexed as Ex. 6 to Cobrinik Decl.), at 88-89 ("I believed . . . [LaBow's] role was to

recommend and then the Committee had to direct any, any agreement or any fund transfers, or

anything like that, that Mr. LaBow didn't have the ability to direct himself, Citibank, to go ahead

and transfer funds."); Kassan Dep. at 37 ("My recollection was that the assets . . . transferred

from WHX pension trust to the Severstal pension trust were made pursuant to directions from

Severstal pension trust.  I believe the gentleman's name was DiClemente.").

We conclude that the evidence defendants have proffered, if credited, would allow a

reasonable jury to conclude that WPN and LaBow did not have discretionary authority or control

over the transfer of the Severstal Plans assets.  That is, a jury could use the defendants' evidence

to find that, notwithstanding the permission given in the language of the WHX Agreement and

the Third Amendment and the other contrary evidence supplied by plaintiffs, WPN and LaBow

did not have any actual authority or control over the transfer of the Severstal Plans assets, because

17

the transfer had to be effectuated by other parties.  We note that it is of no moment that <u>Severstal</u> <u>II</u> previously acknowledged the strength of plaintiffs' evidence on this issue, 2012 WL 3561243, at *5, in denying defendants' motion for summary judgment.  The fact that a court has denied one party's motion for summary judgment on an issue does not require it to grant the adverse party's motion for summary judgment.  <u>See Ass'n of Int'l Auto. Mfrs., Inc. v. Abrams</u>, 84 F.3d 602, 611 (2d Cir. 1996) ("The fact that both sides have moved for summary judgment does not necessarily mean that summary judgment may properly be granted for either side.  Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.") (internal citations and quotation marks omitted); <u>Heublein, Inc. v. United States</u>, 996 F.2d 1455, 1461 (2d Cir. 1993) ("[W]hen faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other.") (citation omitted).

We also reject plaintiffs' implicit argument that we are bound to discount defendants' evidence because <u>Severstal II</u> stated that "'there is no indication in the record that Plaintiffs' formal notification of the [Severstal Trust] custodians was a condition precedent to Defendants' receipt and exercise of' their authority under the Third Amendment."  <u>See</u> Pl. Mem. at 14 (quoting <u>Severstal II</u>, 2012 WL 3561243, at *6).  This statement was not a finding of fact but rather a description of the record then presented to the Court in the context of a particular motion. <u>See Reefer and Gen. Shipping Co., Inc. v. Great White Fleet, Ltd.</u>, 1995 WL 575290, at *5 (S.D.N.Y. Sept. 28, 1995) ("[A]ny statement made by the Court in its prior ruling [on summary judgment] should be interpreted only in light of the limited purpose for which it was made, namely, to determine whether summary judgment was appropriate, and not for the purpose of finding facts or making legal conclusions on a full record disposing of the case on the merits.")

18

(citing <u>Switz. Cheese Ass'n, Inc. v. E. Horne's Market, Inc.</u>, 385 U.S. 23, 25 (1966) ("[T]he denial of a motion for a summary judgment because of unresolved issues of fact does not settle or even tentatively decide anything about the merits of the claim.")).  The record before us now is different from the record before the Court in defendants' prior motion for summary judgment.

Plaintiffs point to case law holding that a party need not have complete discretion in order to be considered a fiduciary.  <u>See</u> Pl. Mem. at 13-14; Pl. Reply at 4-5.  This argument, however, misconstrues defendants' position.  Defendants' position is that they had <u>no</u> ability to perform any act to transfer the assets because the trustees prevented them from exercising authority over the Plans at all.  Thus, plaintiffs' citation to <u>Lowen v. Tower Asset Mgmt., Inc.</u>, 829 F.2d 1209 (2d Cir. 1987), is of no assistance as <u>Lowen</u> involved a situation where the putative plan document had been "orally modified" to deprive the defendant of "discretionary authority in many or all transactions."  829 F.2d at 1218.  The Second Circuit held that in such a situation, the fiduciary "was under an obligation to the Plans to make a professional and independent judgment as to the wisdom of the proposed investments [and if it] viewed the investments negatively, it should have so informed the Trustees and declined to carry out their instructions."  <u>Id.</u> at 1219. Here, by contrast, the defendants assert that they had literally no power to exercise their discretionary authority because the plaintiffs barred them from exercising it.

In addition to the evidence regarding their practical inability to undertake any transactions, defendants point to a provision of the Third Amendment stating that "[t]he Client [meaning, the trust] shall advise the trustee or custodian of the Investment Fund [referring to the bank holding the assets] of the Client's retention of the Consultant [referring to defendants] as provided herein and shall instruct and direct the trustee or custodian to comply with and honor requests and instructions of the Consultant made or given in connection with the exercise of

19

authority granted to the Consultant hereunder."  3d Am. ¶ 10 (incorporating WHX Agreement

¶ 5).  Defendants interpret this provision as a condition precedent to the grant of management

authority, arguing that because no such notice was given to Citibank before the transfer of the

assets on November 3, 2008, defendants had no authority under the investment agreement to act

as fiduciaries to the Severstal Plans and consequently were "powerless to direct investment of the

[Severstal Plans] assets."  See Def. 56.1 Add. Facts ¶ 20.  While plaintiffs have disputed this

interpretation, see Pl. Mem. at 14; Severstal II, 2012 WL 3561243, at *6, the agreement's

language is not clear and we cannot say that defendants should be barred from adverting to this

provision in conjunction with other evidence they have proffered showing they were powerless to

effectuate the transfer.

　　　　In sum, with respect to the asset transfer, there is a factual dispute as to whether

defendants had any authority or control over this transfer.  Accordingly, plaintiffs are not entitled

to summary judgment as to whether defendants were fiduciaries to the Severstal Plans assets with

respect to the asset transfer.

　　　　b.  Events Occurring After the November 3, 2008 Transfer.  We next consider the period

after the transfer of the Severstal Plans assets.  Plaintiffs argue that, even if WPN and LaBow

were not fiduciaries with respect to the transfer of the assets on November 3, they were

fiduciaries following the transfer because they exercised authority and control in making

decisions on the diversification and liquidation of the assets.  See Pl. Mem. at 14-15; 3d Am.

Compl. ¶ 110 ("Defendants breached their fiduciary duties to the [Severstal Plans] . . . by failing

to diversify the Severstal Trust after the original transfer of the Neuberger Berman Account was

made.").  Plaintiffs claim that "the [SRC] informed LaBow that he had the authority to diversify

the Trust and requested that he do so [and] LaBow eventually exercised this authority over the

Severstal Plans' assets by directing the Neuberger Berman assets to be liquidated." Pl. Mem. at 14. To support this assertion, plaintiffs cite to the deposition of Neuberger Berman employee Marvin Schwartz who testified, somewhat equivocally, that it was his belief that LaBow had the power to choose which broker liquidated the Severstal Plans assets and that he "assume[d]" that LaBow was the person who instructed Neuberger Berman to liquidate the Severstal assets. See Deposition of Marvin Schwartz, dated Feb. 27, 2012 (annexed as Ex. J to Bunch Decl. and Ex. 37 to Cobrinik Decl.) ("Schwartz Dep."), at 62-65. However, Schwartz also testified that, on the date that Neuberger Berman liquified the assets, he sent an email to LaBow, informing him that he had spoken with SRC member Dennis Halpin to "confirm that it was all right to liquidate the portfolio." Id. at 66-67. Plaintiffs also cite to an email from DiClemente to LaBow on December 30, 2008, in which DiClemente states: "We therefore maintain our position that the responsibility for the assets is yours alone since you, and not the Retirement Committee, selected Neuberger Berman." Email from Michael DiClemente to Ronald LaBow, dated Dec. 30, 2008 (annexed as Ex. 52 to LaBow Dep.). In an email from Sally King to LaBow, in which King summarized a conference call, she wrote, "Ron LaBow will negotiate the fee adjustment with Neuberger Berman; once the fees are changed, Mike DiClemente will execute the agreement." Conference Call Email, dated Dec. 30, 2008 (annexed as Ex. 56 to LaBow Dep.). An email from Neuberger Berman employee Lorraine Greco sent to LaBow on March 18, 2009, suggests that LaBow fulfilled this obligation to hold fee negotiations with Neuberger Berman. See Lorraine Greco Email, dated Mar. 18, 2009 (annexed as Ex. 77 to LaBow Dep.) (asking LaBow to "call Michael DiClemente . . . and tell him that you approved our pending fee schedule, it needs a signature possibly by a Mr. Halpern (sic). Our hands are tied until this happens.")

 Additionally, plaintiffs presented evidence to rebut defendants' assertion that they had no

authority over the Severstal Plans assets following the transfer because the trustees of the

Severstal Plans were never notified of LaBow and WPN's management authority as allegedly

required by the Third Amendment.  See Pl. Mem. at 20-21.  Plaintiffs assert that, at least by mid-

December, the then-trustee National City ("NatCity") must have been aware of LaBow and

WPN's authority because NatCity's OnBoarding Coordinator Amanda Pierce testified that, as of

December 16, 2008, she had a copy of the Third Amendment and that it reflected that LaBow was

the investment manager of the Severstal Trust.  See Deposition of Amanda Pierce, dated Feb. 17,

2012 (annexed as Ex. I to Bunch Decl. and Ex. 20 to Cobrinik Decl.), 23-24, 29-30.

Finally, plaintiffs argue that, at the very least, WPN and LaBow must have been

fiduciaries for the Severstal Plans by March 20, 2009, because by that time, "the Third

Amendment had been signed, National City recognized Defendants' authority to direct trades by

virtue of the Third Amendment, and Defendants were free to order trades through Neuberger

Berman."  See Pl. Mem. at 22.  In support of this argument, plaintiffs cite to Dennis Halpin's

deposition, in which he testified that at some point around March 20, 2009, he sent an instruction

to Neuberger Berman telling them that LaBow had authority to direct trades.  See Halpin Dep. at

515-16.  Plaintiffs also point to a voicemail message that LaBow left for Halpin on March 23,

2009, in which LaBow accepted responsibility for not diversifying the Severstal Plans assets and

expressed his desire to diversify the assets, see LaBow March 23 Halpin Voicemail, and another

voicemail that same day for Sally King, in which LaBow expressed his intention to "diversify"

the assets, see LaBow March 23 King Voicemail.

This evidence certainly suggests that LaBow and WPN had power to act with respect to

the management of the Severstal Plans assets following the transfer to the Neuberger Berman

account — specifically with regard to the decision to liquidate the assets — and thus that they

22

might be considered fiduciaries of the Severstal Plans.  Nonetheless, defendants have presented

evidence that plaintiffs never instructed the trustee bank to accept defendants' investment

directions.  SRC member DiClemente's testified that, to the best of his knowledge, nobody from

the SRC ever notified Citibank that "LaBow was authorized to act on behalf of the Severstal

Retirement Committee" or that "WPN was the investment manager of the Severstal Pension

Trust."  DiClemente Dep. at 132.  DiClemente further acknowledged that it was his understanding

that "in order for Citibank to take directions from WPN, someone from [the SRC] had to

authorize Citibank to take their actions from WPN."  Id. at 133-34.  Defendants cite to

corroborating testimony from Citibank officer Nancy Kronenberg, who testified that Citibank

never received notification about LaBow's authority over the Severstal Plans and that only

DiClemente was listed in Citibank's records as a person who was authorized to act on behalf of

the Severstal Plans assets.  See Kronenberg Dep. at 72-73.  Furthermore, defendants introduced

into evidence a certificate that plaintiffs gave to NatCity after NatCity succeeded Citibank as

trustee for the Severstal Plans, in which plaintiffs instructed NatCity that only members of the

SRC had "authority to communicate written instruction on behalf of the [Severstal Trust]" and

that only those members were "entitled to act as authorized representatives of the [Severstal

Trust]."  See Certificate as to Signatures for the SWI Pension Plan Master Trust, dated Jan. 6,

2009 (annexed as Ex. 18 to Cobrinik Decl.).  NatCity employee Jacqueline Thomas also testified

that it was her understanding that, because LaBow's name was not included in this certificate, he

was not authorized to act on behalf of the Severstal Trust.  See Deposition of Jacqueline Thomas

(annexed as Ex. 19 to Cobrinik Decl.), at 21-22.

Additionally, there is circumstantial evidence supporting the notion that WPN and LaBow

lacked the power to diversify the trust — specifically, evidence that LaBow made inquiries to the

23

SRC with respect to these matters but that his advice and efforts to diversify were ignored or otherwise stymied by the SRC.  For example, LaBow sent a letter to the SRC on February 4, 2009, in which he expressed a desire to diversify the Severstal Plans assets but acknowledged "[o]f course none of this will be done without your approval."  <u>See</u> LaBow letter to the SRC, dated Feb. 4, 2009 (annexed as Ex. 29 to Cobrinik Decl.).  In an email to the SRC on February 11, 2009, LaBow again urged the SRC to diversify the assets.  <u>See</u> LaBow Email to SRC, dated Feb. 11, 2009 (annexed as Ex. 31 to Cobrinik Decl.).  LaBow asserts in his declaration that the SRC never approved any of his requests to diversify.  LaBow Decl. ¶¶ 75-78.  Finally, defendants have proffered evidence suggesting that the SRC, and not LaBow, made the decision to liquidate the Severstal Plans assets and directed Neuberger Berman to carry through with the liquidation.  They cite to Neuberger Berman employee Marvin Schwartz's deposition, in which he testified that he spoke with SRC member Dennis Halpin on the day that the assets were to be liquidated and that Halpin was the person who confirmed that the SRC wanted the assets to be liquidated.  <u>See</u> Schwartz Dep. at 66-67, 87-88.  Additionally, defendants point to an email that Halpin sent to a Neuberger Berman employee, in which Halpin asked for confirmation that they had everything they needed for the liquidation.  <u>See</u> Halpin Email to Neuberger Berman, dated Mar. 16, 2009 (annexed as Ex. 33 to Cobrinik Decl.).

If the jury were to credit the testimony favorable to the defendants' position, it could reasonably conclude that LaBow and WPN had no discretion or authority over the Severstal Plans with respect to the decision to diversify or liquidate the assets following the transfer.

*      *      *

In light of this conclusion, and the conclusion reached with respect to the transfer itself, a reasonable jury could find that LaBow and WPN never exercised any discretionary authority or

24

control over the Severstal Plans with respect to the claims made in the complaint.  Thus, partial

summary judgment should not be granted on the question of whether LaBow and WPN qualify as

fiduciaries under 29 U.S.C. § 1002(21)(A)(i).[5]

  2.  Section 1002(21)(A)(ii)

As to whether there is a genuine issue of material fact on the issue of LaBow and WPN's

fiduciary status under 29 U.S.C. §1002(21)(A)(ii), we conclude that plaintiffs cannot be granted

summary judgment on this question either – but for an entirely different reason.

As noted previously, the concept of "fiduciary" does not exist in a vacuum and "when

considering the fiduciary status of the various defendants listed in a complaint, the court must not

only consider the plan documents and general allegations of fiduciary responsibility, but the

particular context in which a fiduciary is named or a defendant is alleged to exercise discretionary

responsibility."  Smith, 2011 WL 6208697, at *5 (emphasis added and internal quotation marks

omitted).  Plaintiffs make a general argument that WPN and LaBow qualify as fiduciaries under

section 1002(21)(A)(ii) on the ground that they were providing investment advice and otherwise

meet the elements outlined in the Department of Labor regulations relating to investment

advisors.  See Pl. Mem. at 9-13.[6]  But plaintiffs fail to provide "the particular context," Smith,

---

  [5] Plaintiffs also make arguments regarding whether defendants were "investment managers" under ERISA § 3(38).  Pl. Mem. at 8-9.  ERISA § 3(38), however, merely provides a definition of "investment manager" and does not address the question of whether that manager is a fiduciary.  Notably, the statutory definition of "investment manager" in ERISA § 3(38) assumes that the person or entity is a "fiduciary."

  [6] The Department of Labor ("DOL") has provided guidance for determining when a person is an "investment advisor" fiduciary under § 1002(21)(A)(ii).  Under the DOL regulation, a person "renders investment advice" with respect to an ERISA plan when:

   (i) Such person renders advice to the plan as to the value of securities or other
      property, or makes recommendation as to the advisability of investing in,

25

2011 WL 6208697, at *5, in which they seek to hold the defendants liable for rendering

investment advice.  In other words, they have not explained the particular advice that forms the

basis of their claim for breach of fiduciary duty.  Plaintiffs' failure to do so does not mean of

course that there is no proof that defendants acted as fiduciaries with respect to particular advice

they may have given at particular times.  But in the absence of an explanation as to how that

particular advice forms the basis for a breach of fiduciary duty claim, plaintiffs have failed to

establish that defendants were fiduciaries with respect to any relevant matter.

Defendants raised this precise point in their memorandum of law opposing plaintiffs'

motion for partial summary judgment.  See Def. Mem. at 19-20.  In plaintiffs' reply brief,

---

purchasing, or selling securities or other property; and

(ii) Such person either directly or indirectly . . .

> A. Has discretionary authority or control, whether or not pursuant to agreement, arrangement or understanding, with respect to purchasing or selling securities or other property for the plan; or

> B. Renders any advice described in paragraph (c)(1)(i) of this section on a regular basis to the plan pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between such person and the plan or a fiduciary with respect to the plan, that such services will serve as a primary basis for investment decisions with respect to plan assets, and that such person will render individualized investment advice to the plan based on the particular needs of the plan regarding such matters as, among other things, investment policies or strategy, overall portfolio composition, or diversification of plan investments.

29 C.F.R. § 2510.3-21(c)(1).  Thus, "investment advisors who do not possess discretionary authority over the assets of ERISA-covered plans qualify as fiduciaries only when they (1) provide advice to the plan on a regular basis, pursuant to an agreement with the plan or with a fiduciary to the plan that such advice will be (2) a primary basis for the investment of plan assets and (3) individualized to the particular needs of the plan."  In re Beacon Ass'n Litig., 282 F.R.D. 315, 335 (S.D.N.Y. 2012); accord F.W. Webb Co. v. State St. Bank and Trust Co., 2010 WL 3219284, at *8 (S.D.N.Y. Aug. 12, 2010).

however, they do not respond to this issue but instead make various arguments as to how the defendants fit within the definition of section 1002(21)(A)(ii).  See Pl. Reply at 7-9.  In other words, plaintiffs do nothing to provide the context — that is, the particular acts of giving advice or failures to act in giving advice — that form the basis of their ERISA claims.  Instead, they cite to allegations in the complaint that defendants and WHX  "breached their fiduciary duties and engaged in self-dealing."  Pl. Reply at 8 (citing 3d Am. Compl. ¶¶ 14, 96-114).  The cited allegations do not make any claims regarding the defendants' rendering of "advice," however.  Thus, it is unclear how defendants' "render[ing of] investment advice" or their having "any authority or responsibility to" render such advice, 29 U.S.C. §1002(21)(A)(ii), bears on any of their claims of ERISA violations.  In light of the plaintiffs' failure to provide specific context to the defendants' purported fiduciary status, they have failed to show what "part" of their "claim" is amenable to partial summary judgment.  Fed. R. Civ. P. 56(a).  Accordingly, their motion for partial summary judgment on this issue must be denied.

      B.      WPN and LaBow's "Co-Extensive" Fiduciary Status

Because plaintiffs are not entitled to partial summary judgment on the issue of defendants' fiduciary status, a fortiori, they are not entitled to summary judgment on the question of whether WPN and LaBow's fiduciary status was "co-extensive."   This question cannot be answered in a vacuum.  Moreover, plaintiffs do not explain why any purported "co-extensiveness" is a part of a "claim or defense" that must be adjudicated to resolve this case.  See Fed. R. Civ. P. 56(a).

      C.      WPN's Breach of Contract

Plaintiffs seek partial summary judgment on Count IV of their complaint, which alleges that WPN breached its contract with plaintiffs by failing to maintain a fiduciary insurance policy.  3d Am. Compl. ¶¶ 121-25.  We apply New York contract law in resolving this question because

plaintiffs have alleged that the relevant agreements are "governed by, and construed in accordance with," New York law, see Pl. Mem. at 12, and defendants have not objected to the application of New York law, see Def. Mem. at 18 (applying New York contract law).  See Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such 'implied consent is sufficient to establish choice of law.'") (ellipsis omitted) (quoting Tehran–Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989)).

To recover for a defendant's breach of contract under New York law, a plaintiff must prove by a preponderance of the evidence: "(1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." Diesel Props S.R.L. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 52 (2d Cir. 2011); see also Clearmont Prop., LLC v. Eisner, 58 A.D.3d 1052, 1055 (3d Dep't 2009) (same).  A plaintiff's failure to show that the defendant's breach caused it to suffer damages is "fatal" to the plaintiff's claim.  See LNC Inv., Inc. v. First Fidelity Bank, N.A. N.J., 173 F.3d 454, 465 (2d Cir. 1999) (quoting Cramer v. Spada, 203 A.D.2d 739, 741 (3d Dep't 1994)).  At the same time, courts have granted motions for partial summary judgment on the issue of the defendant's liability for breach of contract while preserving the issue of damages for trial.  See, e.g., Koch Indus., Inc. v. Hoechst Aktiengesellschaft, 727 F. Supp. 2d 199, 226 (S.D.N.Y. 2010); Ghim Li Global Pte Ltd. v. MCCC Sportswear, Inc., 2008 WL 4449054, at *6 (S.D. Ohio Sep. 29, 2008).

Defendants argue that summary judgment cannot be granted because plaintiffs have not put forth any evidence that they suffered damages caused by WPN's alleged breach of the contract, and damages has been defined by case law to be one of the elements necessary to obtain

28

recovery for breach fo contract.  See Def. Mem. at 18.  The defendants' arguments on this point seems to be more a matter of semantics than of substance because it is clear that plaintiffs are entitled to partial summary judgment on the non-damages elements of their claim for breach of contract.

First, there is no dispute about the validity of the contract.  Both WPN and the Severstal Retirement Committee signed the Third Amendment to the WHX Investment Agreement by December 5, 2008, see Pl. 56.1 Statement ¶ 36; LaBow Dep. at 551, 555, and the Third Amendment required WPN "to obtain and maintain in effect a fiduciary liability insurance policy or policies for the benefit of the Severstal Plan," Pl. 56.1 Statement ¶ 25 (citing 3d Am. ¶ 10). Second, defendants do not contend that plaintiffs failed to perform their contractual obligations in any way.  See generally Def. Mem at 18-19.  Finally, it is undisputed that WPN failed to obtain a fiduciary liability insurance policy for the benefit of the Severstal Plans, in breach of the plain terms of the contract.  See Pl. 56.1 Statement ¶ 59; LaBow Dep. at 104, 109, 510.

In light of the fact that plaintiffs are entitled to summary judgment on the non-damages elements of their breach of contract claim, it hardly matters whether we say they are entitled to partial summary judgment on the issue of liability for breach of contract or partial summary judgment on the first three elements of a breach of contract claim.  In the Court's view, plaintiffs' proof here would normally be characterized in legal parlance as demonstrating defendants' "liability for breach of contract."  Accordingly, we will use the more common terminology. Obviously, plaintiffs will not be able to recover on their claim if they do not ultimately prove damages attributable to the breach.

IV.   CONCLUSION

For the foregoing reasons, plaintiffs' motion for partial summary judgment (Docket # 188) should be denied, except that plaintiffs should be granted summary judgment on their claim for liability for breach of contract.

## PROCEDURE FOR FILING OBJECTIONS TO THIS
## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. See also Fed. R. Civ. P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Laura Swain, and to the undersigned, at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Swain. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated:  December 12, 2013
        New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge