UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

SEVERSTAL WHEELING, INC.
RETIREMENT COMMITTEE, TIMOTHY S.
ROGERS, MELVIN BAGGETT, WILLIAM
DREW LANDON (AS NAMED FIDUCIARY
OF THE WHEELING CORRUGATING CO.
RETIREMENT PLAN, THE SALARIED
EMPLOYEES' PENSION PLAN OF
SEVERSTAL WHEELING, INC.), RICHARD
CARUSO, THE WHEELING CORRUGATING
CO. RETIREMENT SECURITY PLAN and
THE SALARIED EMPLOYEES' PENSION
PLAN OF SEVERSTAL WHEELING,

       Plaintiffs,

     -v-                                   No.  10CV954-LTS-GWG

WPN CORPORATION (IN ITS OWN
CAPACITY AND AS NAMED FIDUCIARY
OF THE WHEELING CORRUGATING CO.
RETIREMENT SECURITY PLAN AND THE
SALARIED EMPLOYEES' PENSION PLAN
OF SEVERSTAL WHEELING, INC.) and
RONALD LABOW (IN HIS INDIVIDUAL
CAPACITY AND AS NAMED FIDUCIARY
OF THE WHEELING CORRUGATING CO.
RETIREMENT SECURITY PLAN AND THE
SALARIED EMPLOYEES' PENSION PLAN
OF SEVERSTAL WHEELING, INC.),

       Defendants.

-------------------------------------------------------x


OPINION AND ORDER

APPEARANCES:

COHEN MILSTEIN SELLERS & TOLL P.L.L.C.
By: Mark A. Willard, Esq.
    Matthew Alexander Smith, Esq.
    Monya Monique Bunch, Esq.
    Robert Joseph Barton, Esq. (pro hac vice)
1100 New York Ave., NW
Washington, DC 20005-3934
    -and-
    Michael Benjamin Eisenkraft
88 Pine Street, 14th Floor
New York, NY 10005

*Attorneys for Plaintiffs*

DANIEL COBRINIK, P.C.
By: Daniel Cobrinik, Esq.
276 Park Avenue South,
Suite 405
New York, NY 10001

*Attorney for Defendants*

LAURA TAYLOR SWAIN, United States District Judge

Plaintiffs, who are the current members of the Severstal Wheeling, Inc. Retirement Committee (the "Severstal Retirement Committee") bring this action in their representative capacity, together with the Severstal Plans (defined below), against Defendants WPN Corporation ("WPN") and Ronald LaBow, who is WPN's principal and sole executive officer ("LaBow" and, together with WPN, "Defendants"). Defendants served at all relevant times as the investment advisors and/or managers of two defined contribution plans sponsored by Severstal Wheeling Inc. ("SWI") and its predecessors, the Wheeling Corrugating Company Retirement Security Plan and the Salaried Employees Pension Plan of Severstal Wheeling (together the "Severstal Plans"). Plaintiffs assert that Defendants failed to prudently and loyally manage and diversify the Severstal Plans' assets and advise the Plans' fiduciaries, and that Defendants breached their contract with the Severstal Plans by failing to obtain fiduciary insurance covering claims for breach of fiduciary duty, under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq.

The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331.

The Court held a bench trial from July 8, 2014 through July 22, 2014, observing each witness carefully, and has reviewed thoroughly the evidence presented and the pre and post trial submissions of the parties.

This Opinion and Order constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent a finding of fact includes a conclusion of law, it is deemed a conclusion of law, and vice versa.

For the following reasons, the Court finds that Defendants breached their fiduciary duties to the Severstal Plans in violation of ERISA and are liable for the full amount of the Plans' resulting investment losses, as well as for disgorgement of the fees that they received

during the relevant period under WPN's investment management agreement with the Severstal

Plans.

I.
<u>FINDINGS OF FACT</u>

The following findings of fact are based on the trial record, which includes the

parties' stipulation of certain facts.[1]  Unless otherwise indicated, Plaintiffs have proven the facts

set forth below by a preponderance of the credible evidence.

This litigation arises from the transfer of certain employee benefit plan assets

from a pooled employee benefit plan trust maintained by SWI's former affiliate WHX (the

"Combined Trust") to a separate trust for three SWI-sponsored plans (the "Severstal Trust"), and

the failure to diversify, for a period of time, the Severstal Plans' assets transferred to the new

trust.  Prior to the transfer, the assets of the Severstal Plans constituted approximately 10 percent

of the assets in the Combined Trust.  (Stip. ¶ 19.)  The Severstal Plans are defined contribution

plans regulated by ERISA.  (Stip. ¶ 1.)  The Plans are "employee pension benefit plan[s]" within

the meaning of 29 U.S.C. Section 1002(2)(A).  The Severstal Plans' documents provide that the

Severstal Retirement Committee, whose members are appointed by SWI, are the "Named

Fiduciaries" of the Plans and the Plan Administrator of the Plans.[2]  At the time of trial, Plaintiffs

Richard Caruso, William Drew Landon, and Timothy Rogers comprised the Severstal

_____

[1]      The parties stipulated to certain facts in Part II of their Joint Pre-Trial Statement (<u>see</u>
docket entry no. 229, hereinafter referred to as "Stip.").

[2]      ERISA requires that every employee benefit plan "provide for one or more named
fiduciaries who jointly or severally shall have authority to control and manage the
operation and administration of the plan."  29 U.S.C.S. § 1102(a)(1) (LexisNexis
2011).  The Severstal Plans each provide that the Retirement Committee is the Plan
Administrator and that the members of the Retirement Committee are "deemed
Named Fiduciaries within the meaning of ERISA."  (Joint Ex. 6 § 8.010; Joint Ex. 7 §
9.1.)

Retirement Committee.  (Stip. ¶ 2.)  Plaintiffs' predecessor committee members include Michael DiClemente, Dennis Halpin, and Vince Assetta.  Defendant WPN, acting through its principal LaBow, served as Investment Manager to the Combined Trust, and as Investment Manager to the Severstal Trust.  LaBow is the former non-executive Chairman of WHX and was President of one of WHX's predecessor companies through at least 2009.  He founded WPN in 1987.  WPN registered with the Securities & Exchange Commission as an investment advisor in March 2008 under the Investment Advisors Act of 1940.  (Stip. ¶ 1.)

Defendants' Role as Investment Manager of the Combined Trust

WPN entered into the WHX Corporation Investment Consulting Agreement with WHX (the "WHX Investment Agreement") after LaBow stepped down as chairman of WHX in 2004.  (See id.; Stip. ¶ 21; Joint Ex. 1.)

The WHX Pension Investment Committee was responsible for overseeing the activities of WPN and LaBow in investing and managing the Combined Trust.  (Trial Tr. (Kassan) at 804:6-10; id. (McCabe) at 1197:24-1198:3.)  The WHX Pension Administration Committee was responsible for ordering transfers of funds and disbursements of benefits from the Combined Trust.  (Id. (Kassan) at 804:20-22.)  After the separation of SWI's predecessor from WHX in 2003, the assets of the Wheeling Corrugating Plan and the Salaried Employees Plan continued to be held in the Combined Trust.  (Stip. ¶ 17.)

The WHX Investment Agreement "authorize[d] and direct[ed]" WPN "to exercise complete, unlimited and unrestricted management authority with respect to" the assets in the Combined Trust, including the assets of the Severstal Plans.  (Joint Ex. 1, ¶ 7.)  The Agreement specifically gave WPN the authority: "(a) To invest and reinvest the [Combined Trust] at such

time and in such manner as [WPN] in the complete and unlimited exercise of its discretion shall

determine; (b) To purchase and sell securities for the [Combined Trust] in the name of [WHX],

for the account of [WHX] and at the sole risk of [WHX]; (c) To arrange for the delivery of and

payment for any such investments, including securities, bought and sold for the account of

[WHX Corporation]; (d) In effecting any such investments, reinvestments, purchases and sales,

to use and obtain the assistance and services of such brokers, dealers, investment bankers,

underwriters and other firms, enterprises and services as [WPN] in its discretion shall designate

or select[.]"  (Joint Ex. 1 ¶ 7 (a)-(d).)  In practice, Defendants advised the WHX Retirement Plan

Committee on Combined Trust investments, and on investment managers with whom to invest

Combined Trust assets, and those decisions were then implemented by individuals employed by

WHX.  (Trial Tr. (LaBow) 210:19-24; id. (Riposo) at 132:14-20, 135:17-20; id. (Kassan) 804:6-

25, 807:25-808:6; id. (DiClemente) at 548:5-10; 777:16-21; id. (King) at 1089:23-1090:8; Pls.

Exs. 66, 70.)  There is no evidence of any investment decision taken for the Combined Trust at

any time relevant to this litigation that was not the product of a recommendation by LaBow,

WPN, or both.  LaBow communicated periodically with the Severstal Retirement Committee

prior to the creation of the separate Severstal Trust, but all investment decisions for the

Combined Trust were made and/or implemented by the WHX Pension Investment Committee or

other agents of WHX on the basis of LaBow's recommendations through WPN.

       In March 2008, the WHX Pension Investment Committee commissioned an

analysis by Aon Investment Consulting ("Aon") of whether WPN's fees and responsibilities

should be changed.  (Trial Tr. (Kassan) at 812:3-12.)  Aon recommended that WHX approve

WPN's request to increase its fees from the 50 basis points provided for by the WHX Investment

Consulting Agreement to 90 basis points.  (Pls. Ex. 1 at 1-2.)  Aon also recommended that WHX

"review and if necessary amend the Investment Policy Statement" for the WHX Pension Plans

"to provide for the delegation of investment authority to WPN and remov[e] the requirement of

final Committee approval for investment selection, and to provide for the ongoing oversight

responsibilities of the Committee."  (Pls. Ex. 1 at 2.)

   LaBow and WHX executed a Second Amendment to the WHX Investment

Agreement (the "Second Amendment") to be effective August 1, 2008, (stip. ¶ 23; Joint Ex. 3),

which incorporated the changes to LaBow's investment management agreement that had been

recommended by the Aon report,  (see Trial Tr. (Kassan) at 817:11-26.)  WPN's title was

changed from Investment Consultant, to Investment Manager of the Combined Trust.  (Joint Ex.

3 ¶ 1.)  In modified paragraph 3(m), WPN represented that "LaBow has the primary

responsibility for performing the services of the Manager with respect to" the Combined Trust.

In modified paragraph 3(e), WPN represented that it was registered with the SEC under the

Investment Advisors Act of 1940.  (Id. ¶ 2.)  A new paragraph 7 recited that WPN was

empowered to select and designate other investment managers to manage the Combined Trust,

and that WPN was a "Named Fiduciary" for these purposes.  (Id. ¶ 5.)  Paragraph 10 of the

Second Amendment modified Exhibit A of the WHX Investment Agreement to provide WPN

with increased fees for its services as Investment Manager, rather than as a mere Investment

Consultant.  As modified, Exhibit A provided that WPN would be paid a fee of 90 basis points

per year on the value of the Combined Trust.  (Id. ¶ 10.)  Paragraph 11 of the Second

Amendment provided that, "as amended," the WHX Investment Agreement would continue in

full force and effect.  (Id. ¶ 11.)  Paragraph 11 incorporated paragraph 7 of the original WHX

Investment Agreement in its entirety, including its provisions that "authorize[d] and direct[ed] [WPN] to exercise complete, unlimited, and unrestricted management authority with respect to the investment of" the assets contained in the Combined Trust.  (Id. ¶ 11; Joint Ex. 1 ¶ 7(d).) WPN continued to have power to retain broker-dealers to make transactions in Trust assets. (Joint Ex. 1 ¶ 6; Joint Ex. 3 ¶ 11.)

At all relevant times through late 2008, Citibank was the custodial trustee of the Combined Trust pursuant to the Wheeling-Pittsburgh Steel Corporation Pension Plan Trust agreement, dated December 23, 2003.  (Joint Ex. 5.)

The terms of the WHX's Trust Agreement with Citibank required Citibank, as Trust Custodian, to follow the directions of a designated Investment Manager.  (Id. § 4.2(a) ("The Trustee shall follow the directions of an Investment Manager regarding the investment and reinvestment of the Trust Fund . . . .").)  The terms of the Citibank Trust Agreement also required Citibank to notify the WHX Pension Committee and to convert the assets held at Citibank into cash equivalents if the Committee did not properly notify them of the Investment Manager or other fiduciary with authority to direct investments.  (Id. § 4.2 ("In the event the Pension Investment Committee shall fail to specify pursuant to this Section 4.2 the person or persons who are to manage the investment of the Trust or any portion thereof, the Trustee shall promptly give notice of this fact to the Pension Investment Committee and shall invest the Trust or such portion solely in short term obligations . . . .").)  The Trust Agreement also authorized Citibank to accept trade directions issued by an investment manager to a broker.  (Id. § 4.2(a) ("[T]he Trustee, upon direction by the Investment Manager, shall execute and deliver the appropriate trading authorizations" for trades ordered through a broker by the Manager).)

Notwithstanding the provisions of the amended WHX Investment Agreement and the foregoing provisions of the WHX Trust Agreement, Defendants did not direct Citibank to make investments of the Combined Trust assets, and Citibank was never specifically notified of such authority.  WHX Treasurer David Riposo and WHX Pension Investment Committee members Glen Kassan and James McCabe each testified that WPN made investment recommendations for the combined WHX Trust, but had no authority to make investment decisions.  They each testified credibly that the WHX Pension Investment Committee made all investment decisions, and it is clear that their understanding was that Defendants only had authority to render investment advice to the Committee .  (Trial Tr. (Riposo) 132:14-20; id. (McCabe) 1210:22-1212:4; id. (Kassan)1306:16-1307:4.)  There is no evidence, however, that WPN's advice was ever rejected, or that LaBow expected that his advice would not be followed. SWI and Severstal Retirement Committee were never put in a position to make investment decisions for the Combined Trust.

Citibank's Plan to Exit the Trust Business;
<u>Need for Separation of Severstal Plan Assets from Combined Trust</u>

By June 2008, Citibank had decided to exit the trust business.  (Stip. ¶ 24.)  By no later than June 18, 2008, WPN, LaBow and WHX had learned that Citibank intended to withdraw as trustee of the Combined Trust and that the assets of the Severstal Plans had to be transferred to a new and separate trust and placed with a new trustee.  (Pls. Ex. 3; Joint Ex. 11; Trial Tr. (Riposo) at 75:9-14.)  WHX and LaBow told Michael DiClemente, member of the Severstal Retirement Committee, on or about June 18, 2008, that the Trust assets would need to be separated.  (See Joint Ex. 11; Trial Tr. (DiClemente) at 420:17-20.)  By letter dated June 18,

2008, WHX informed DiClemente that the trust separation would occur on September 30, 2008.

(Joint Ex. 11.)

LaBow Agrees to Continue Serving as Severstal Plans'
<u>Investment Manager After Trust Separation</u>

During the summer of 2008, LaBow initiated discussions with DiClemente about

continuing to function as the Severstal Plans' investment manager after the trust separation.

(Trial Tr. (DiClemente) at 421:3-21.)  LaBow and DiClemente agreed, prior to November 3,

2008, that WPN would continue acting as the Severstal Plans' investment manager after the trust

separation:

> Q: And you had indicated that you were willing to do so, correct?
> A: Yes, I did.
> . . .
> Q: You had conversations where both of you—you had indicated to him you were
> interested in continuing the investment manager and he had indicated to you that
> he was interested in having you continue [as] investment manager prior to
> November 3, 2008?
> A: Yes.

(<u>Id.</u> (LaBow) at 264:2-10, 265:23-266:3.)

LaBow told Riposo to send DiClemente copies of the First and Second

Amendments and the WHX Investment Consulting Agreement.  (<u>See id.</u> (LaBow) at

186:25-187:5.)  LaBow understood that the Severstal Retirement Committee would modify the

Second Amendment to create a separate management contract regarding the Severstal Plans.  (<u>Id.</u>

at 265:14-19.)  DiClemente also understood that the WHX agreements would be used to create

an investment management agreement with the Severstal Retirement Committee.  (<u>Id.</u> at

430:14-20.)  In mid-October 2008, the Severstal Retirement Committee's attorney, Sally King,

began converting the Second Amendment into a Third Amendment, to create an investment

management agreement between WPN and the Severstal Retirement Committee (the "Severstal

Investment Management Agreement").  (Id. (King) at 1088:24-1089:4.)  King adapted the

Second Amendment in order to have an agreement drafted as quickly as possible due to the

upcoming trust separation.  (Id. at 1089:9-13.)  She finished her initial draft of the Severstal

Investment Management Agreement around October 22, 2008.  (Id. at 1089:5-6.)

Each of the Severstal Plans empowered the Severstal Retirement Committee and

its members, as Named Fiduciaries of the plans, to appoint one or more Investment Managers as

defined in ERISA Section 3(38) to manage the Plan's funds, providing that "[u]pon the

acceptance by the Investment Manager of the fiduciary duty incident to such appointment, such

investment manager shall be solely liable for all investment actions taken concerning the assets

of [the] Plan which are subject to his management."  (Joint Ex. 6 §§ 8.010, 8.110; Joint Ex. 7 §§

9.1, 9.11.)

LaBow signed the Severstal Investment Management Agreement on behalf of

WPN on December 5, 2008, dating the agreement as of November 1, 2008.  (Stip. ¶ 26; Joint Ex.

4.)  On or shortly before December 5, 2008, DiClemente signed the Severstal Investment

Management Agreement on behalf of SWI and the Severstal Plans and as a member of the

Severstal Retirement Committee.  (Joint Ex. 4; Pls. Ex. 29.)  The Severstal Investment

Management Agreement was substantially identical to the Second Amendment, except that it

defined Defendants' duties with respect to the newly separated Severstal Trust rather than the

Combined Trust.  (Compare Joint Ex. Nos. 3 and 4.)  LaBow handwrote onto the Severstal

Investment Management Agreement an effective date of November 1, 2008, two days prior to

the date on which the Severstal Plan assets had been transferred to the Severstal Trust.  LaBow

acknowledged that the Severstal Investment Management Agreement made him a fiduciary for

the Severstal Trust.  (Trial Tr. (LaBow) at 370:12-14.)

Both the Second Amendment and the Severstal Investment Management Agreement incorporated paragraph 7 of the original WHX Corporation Investment Consulting Agreement, which provided that, subject to the Client's timely communicated investment policies and the standards imposed by Section 404(a) of ERISA, 29 U.S.C. § 1104(a), WPN was to exercise complete, unlimited and unrestricted management authority with respect to the investment of the Investment Fund, including having the authority:

(a)    To invest and reinvest the Investment Fund at such time and in such manner as [WPN] in the complete and unlimited exercise of its discretion shall determine;

(b)    To purchase and sell securities for the Investment Fund in the name of the Client for the account of the Client and at the sole risk of the Client;

(c)    To arrange for the delivery of and payment for any such investments, including securities, bought and sold for the account of the Client;

(d)    In effecting any such investments . . . to use and obtain the assistance and services of such brokers, dealers . . . and other . . . services as [WPN] in its discretion shall designate or select.

(Joint Ex. 1 at 3; see Joint Ex. 2 at 4; Joint Ex. 4 at 4.)  Under both the Second Amendment and the Severstal Investment Management Agreement, WPN represented and warranted that it was a registered investment advisor under the Investment Advisors Act of 1940 and that it "ha[d] the primary responsibility for performing the services of [WPN] with respect to the Investment Fund."  (Joint Ex. 3 at 3; Joint Ex. 4 at 2-3.)  WPN further represented and warranted in the Second Amendment that all of its management actions under the agreement "shall be in accordance with ERISA."  (Joint Ex. 3 at 4.)  In the Severstal Investment Management Agreement, WPN represented and warranted that "all actions taken by [WPN] under this

Agreement shall be in accordance with ERISA" and that WPN "acknowledge[d] that it is a fiduciary acting within the scope of section 3(38) of ERISA." (Joint Ex. 4 at 4.) Both the Second Amendment and the Severstal Investment Management Agreement further provided that WPN would be paid an annual fee of .90 percent of the value of the Investment Fund (i.e., 90 basis points) for its services. (Joint Ex. 3 at 8; Joint Ex. 4 at 7.)

<u>Planning for Asset Transfer to Severstal Trust</u>

In an email dated September 15, 2008, WHX Treasurer David Riposo informed LaBow that DiClemente had requested that assets be transferred from the Combined Trust to the new trust for the Severstal Plans in cash. (Pls. Ex. 17.) LaBow responded in an email on the same day, stating that "[Severstal] may not get cash. We shall see." (Pls. Ex. 18.) On September 30, 2008, DiClemente and WHX CEO and Pension Investment Committee Member Glen Kassan signed an agreement to transfer the Severstal Plan assets "in the same percentage allocations as existed in the WHX Pension Trust . . . on or about September 30, 2008." (Pls. Ex. 28.) Although LaBow did not sign that agreement, he understood that DiClemente and Kassan had reached an agreement as of September 30, 2008, that the Severstal Plans would receive a proportional allocation of the Combined Trust portfolio and had received a copy of the agreement. (Trial Tr. (LaBow) 223-11-41; Pls. Ex. 31.) LaBow also understood that, if Severstal and WHX agreed to something, he would have to adhere to that agreement. (Id. at 224:20-22.) At all times thereafter prior to the transfer of assets, which ultimately occurred on November 3, 2008, rather than September 30, 2008, and into December 2008, the Severstal Retirement Committee believed that the new trust would receive a proportional allocation, or a "slice," of the Combined Trust portfolio. (Trial Tr. (DiClemente) at 424:21-425:12, 434:19-435:11.)

LaBow testified at trial that Defendants discovered prior to November 3, 2008, that it was not possible for the new Severstal Trust to receive a "slice" of each Combined Trust investment account.  Some of the Combined Trust's investment vehicles had liquidity restrictions, which Defendants surmised would have hampered the ability of the Severstal Trust to pay benefits.  These investments typically required that an investor give notice in writing of an intended withdrawal "ninety days or sixty days before the end of their fiscal year," and the investor would be cashed out only after the end of year audit was completed.  These investment vehicles also required sixty to ninety days advance notice before the end of a quarter for a partial liquidation.  (Id. (LaBow) 343:11-347:1, 1039:3-22.)  LaBow also asserted at trial that other Combined Trust investments could not be transferred to the Severstal Trust because they had minimum capital requirements that the Severstal Trust could not meet.  (Id. (LaBow) 343:25-344:18.)  Defendants proffered no written corroboration or other support for these assertions, nor did LaBow explain why the requisite advance notice could not have been given. In addition, LaBow's assertions regarding minimum capital requirements were called into question by other trial testimony.  (See, e.g., Trial Tr. (Porten) 1342:22-1343:4, 1344:19-24, 1437:4-6, 1438:14-17.)

LaBow testified that, after Defendants determined that a "slice" was impossible, they advised the Severstal Retirement Committee and WHX Pension Investment Committee that the Combined Trust should transfer assets that had no minimum capital requirements and that could be liquidated right away.  (See id. (LaBow) 348:10-24.)

No transfer was made on September 30, 2008, the date WHX had previously announced as the transfer date.  In an email dated October 3, 2008 —three days after the previously announced transfer date—Riposo asked LaBow, "have you identified the assets to

move to [Severstal]?  Anything WHX needs to sign?"  (Pls. Ex. 29.)  LaBow replied via email

on the same day that he was "working on it."  (Pls. Ex. 31.)  LaBow emailed WHX Pension

Investment Committee Chairman and CEO Glen Kassan on October 6, 2008, regarding the trust

separation, stating that LaBow had "a suggestion about transfer and also a problem—need to

speak with you tomorrow—where should I call?"  (Pls. Ex. 33; Trial Tr. (Kassan) at 821:9-12,

21-23.)

        By letter dated October 22, 2008, LaBow told DiClemente that the transfer had

not occurred on September 30, 2008.  (Pls. Ex. 47.)  Although his letter identified "market

volatility" as the reason that the transfer did not occur on September 30, 2008, LaBow did not

actually believe that market volatility was the reason why the transfer did not occur on

September 30, 2008.  (Trial Tr. (LaBow) at 225-7:10.)  He did not explain the true cause of the

delay.  In the October 22, 2008 letter, LaBow told DiClemente: "On November 3, 2008, I intend

to direct the transfer of most of the assets of the plans to the [Severstal] Trust."  (Pls. Ex. 47.)

Although LaBow did not sign this letter, he approved the content of the letter and directed his

secretary to put it on WPN letterhead and send it on his behalf.  (Trial Tr. (LaBow) at 226:15-19;

240:9-16.)   At the time he received the October 22, 2008, letter from LaBow, DiClemente

understood that the assets that would be transferred would be SWI's proportional share of the

Combined Trust investments.  (Trial Tr. (DiClemente) 428:21-25, 429: 1-13.)  LaBow had not

indicated otherwise to DiClemente.  (Id.)

        As of October 31, 2008, the Combined Trust contained a portfolio of twenty-one

separate accounts.  The portfolio included an account managed by Neuberger Berman, LLC,

composed of thirteen large-capitalization equity securities, eleven of which were energy-sector

stocks, comprising approximately 97 percent of the value of assets in the account (the

"Neuberger Berman Account").  (Stip. ¶ 30; Joint Ex. 10.)  The Combined Trust also contained a

contribution/distribution account that consisted of funds used to make monthly pension

payments and in which cash was held for future reinvestment if other funds in the Trust were

liquidated.  (Trial Tr. (Riposo) at 73:8-18.)  The assets of the Severstal Plans constituted

approximately ten percent of the assets of the Combined Trust and the remaining ninety percent

of the assets in the Combined Trust constituted assets of benefit or retirement plans sponsored or

maintained by WHX or its subsidiaries (the "WHX Plans")  (Id.)  The expenses and the

investment gains of the Combined Trust were shared ratably among the Severstal Plans and

WHX Plans across the entire asset base of the Combined Trust.  (Id. at 68:11-15; id.

(Kronenberg) at 1219:24-1220:1.)  The Severstal Plans owned a percentage interest in each

investment held in the Combined Trust.  (Id. (Kronenberg) at 1219:19-23, 1227:10-13.)

The November 3, 2008, Asset Transfer

       On October 31, 2008, LaBow emailed WHX Treasurer David Riposo

instructed him to "transfer the entire [Neuberger Berman Account] to Severstal Wheeling prior

to market opening on November 3, 2008."  (Joint Ex. 13.)  Riposo forwarded that email to James

McCabe, then a Vice President of WHX and a member of the WHX Pension Administration

Committee and Glen Kassan, WHX CEO and Pension Investment Committee Member.  (Pls. Ex.

61.)  Kassan responded to LaBow that he "would like to discuss this" over the weekend.  (Id.)

LaBow responded that "the world is very difficult right now and I would appreciate leaving this

alone unless there is a violation of ERISA."  (Id.)  Kassan then responded, "I am not suggesting

we change anything.  As a member of the Investment Committee I would simply like to

understand why you have changed the process from the last one you discussed with me and how

it will affect our pension plan." (Id.)  LaBow replied, "I will call you tomorrow."  (Id.)  LaBow

could not recall whether he in fact called Kassan that weekend.  (Trial Tr. (LaBow) 245:5-12.)

        Upon the November 3, 2008, written instructions of McCabe, Citibank transferred

the entire contents of the Neuberger Berman Account—an undiversified portfolio principally

comprised of large-cap energy stocks—to the new Severstal Trust on that date.  The Severstal

Trust funds were held by Citibank at that time.  Citibank carried out the transfer instruction on

Monday, November 3, 2008, and the transaction settled on that date.  (Stip. ¶ 33.)  Neither the

Severstal Retirement Committee nor any other representative of SWI gave Citibank instructions

regarding the transfer on or before November 3, 2008.

        LaBow had advised WHX to transfer the Neuberger Berman Account, instead of

cash or a diversified group of investments, to the Severstal Trust.  Although LaBow could have

had the Neuberger Berman account liquidated prior to the transfer, so that the Severstal Trust

would receive cash, he did not do so.  LaBow testified that he did not know why he did not

recommend that the transfer occur in cash, but asserted that he believed the transferred assets

were the equivalent of cash.  (Trial Tr. (LaBow) 361: 24-362:4.)  Neither LaBow, nor anyone

from WHX or Citibank, informed any SWI representative that the Severstal Plans' trust would

be receiving the whole of the Neuberger Berman Account and nothing else, nor did any of those

parties inform SWI of the asset composition of the Neuberger Berman Account.

        On November 4, 2008, Nancy Kronenberg, Citibank's Trust Administrator for

Master Trust and Custody, requested that DiClemente send her a letter to accept the transfer that

had occurred on November 3.  (See Joint Ex. 15; Trial Tr. (Kronenberg) at 1232:2-7.)

DiClemente sent a letter to Kronenberg which specified that the transfer of Neuberger Berman

assets should occur "[a]s part of transferring the assets of" the Severstal Plans "from the WHX

Corporation trust to SWI's existing trust at Citibank." (Joint Ex. 5.) DiClemente testified

credibly that he did not understand that the Neuberger Berman Account assets were the only

assets being transferred to the Severstal Trust. Rather, he thought that Severstal Plans were

receiving a proportion of each of the assets held in the WHX Combined Trust.

      As of October 31, 2008, the Severstal Plan assets were worth $38,147,879.49.

(Joint Ex. 18.) At that time, the market value of the Neuberger Berman Account was

$31,446,845.38. (Id.) After the November 3, 2008, transfer, the Severstal Plans' interest in the

Combined Trust was treated as limited to the excess of the Severstal Plans' October 31, 2008,

total asset value over the October 31, 2008, market value of the Neuberger Berman Account

assets. The only investments held in the Severstal Trust from November 3, 2008, until March

24, 2009, were the undiversified Neuberger Berman Account assets.

      LaBow testified that he understood that, as of November 3, 2008, he did not have

the ability to liquidate the securities in the Neuberger Berman Account that had been transferred

to the Severstal Trust and he was aware that SWI did not have an account management

agreement with Neuberger Berman, so Neuberger Berman also lacked the ability to liquidate

those securities on the Severstal Plans' behalf as of that date. (Trial Tr. (LaBow) 261:18-

262:21.)

      Citibank did not require the Combined Trust assets to be separated until the end

of 2008; LaBow thus could have waited until a manager or management plan was put in place

before directing the transfer of assets that would have to be liquidated and reinvested to achieve

a diversified portfolio. (See id. (Porten) at1331:3-19; id. (DiClemente) at 428:8-20.)

Defendants did not put a plan of management in place for the transferred assets, did not liquidate

or reinvest those assets, and did not inform the Severstal Retirement Committee of the need for

immediate attention to the management of those assets.  Notwithstanding the fact that the

Severstal Plans' assets were part of the Combined Trust and his prior agreement to continue to

manage Severstal Plan investments following the creation of the Severstal Trust, LaBow did not

acknowledge at trial that he had any professional or legal obligation to the Severstal Plans during

the decision making process that led up to the transfer of assets to the new Severstal Trust.

LaBow admitted that he had not thought about the fact that he was transferring assets that

belonged to the Severstal Plans.  (Trial Tr. (LaBow) at 1051:6-11.)  He claims that he did not

understand that he had any responsibility for assets belonging to the Severstal Plans on October

31, 2008.  (Id. at 1051:20-23.)  Rather, LaBow testified, he "felt that he was an employee—that

[he] had an arrangement with the WHX trust only."  (Id. at 1051:23-24.)

The Severstal Retirement Committee Discovers that Plan Assets Are Not
Managed or Diversified

Sometime in late-November 2008, Severstal Retirement Committee attorney

Sally King reviewed an investment management agreement with Neuberger Berman that LaBow

was recommending the Committee sign.  (See Trial Tr. (King) at 1080:6-8, 1142:10-17.)  King

concluded that it would not be prudent for the Severstal Retirement Committee to sign the

agreement because the Severstal Plans would then be paying duplicative fees to Neuberger

Berman, as LaBow was already obliged to provide the investment management services under

the Severstal Investment Management Agreement.  (See id. (DiClemente) at 442:15-443:3; id.

(King) at 1080:9-1081:4, 1083:20-24.)

DiClemente learned for the first time on December 12, 2008, that Neuberger

Berman was not continuing to manage any portion of the Severstal Plans' assets.  (Defs. Ex. G;

Trial Tr. (DiClemente) at 598:9-12.)  LaBow had not told DiClemente that the Severstal Plans'

assets were not being managed before.  (Trial Tr. (DiClemente) at 775:24-776:4.)  Although there is evidence that LaBow suggested to DiClemente that SWI should retain Neuberger Berman as manager of the account, the Court finds credible DiClemente's testimony that he and the Severstal Retirement Committee believed that Defendants had investment management responsibility and authority over the assets.  The Court does not credit LaBow's suggestion that he clearly informed DiClemente or any other representative of the Severstal Retirement Committee that Defendants were not managing the assets or that there were any serious impediments to Defendants' active management of the transferred assets.

On or about December 18, 2008, LaBow tried to open an account for the Severstal Trust assets at Neuberger Berman.  LaBow testified that Neuberger Berman refused to accept his signature to open an investment management account for the Severstal Trust.  He testified that he and WPN could not open a brokerage account for the Severstal Trust anywhere else because he did not have authority over the funds.  (Trial Tr. (LaBow) 367:23-368:15, 371:11-15; Pls. Ex. 78.)  LaBow recommended that the Severstal Retirement Committee enter a management agreement with Neuberger Berman to manage the Severstal Plans' funds.  He took no steps to manage the assets through WPN, despite the authorization provisions of the Second Amendment, which were carried over into the Severstal Investment Management Agreement, nor did he recommend that SWI open a brokerage account for the Severstal Trust to facilitate the operation of transactions directed by WPN.

On December 30, 2008, King and DiClemente instructed LaBow to renegotiate the fees with Neuberger Berman before the Severstal Retirement Committee signed a management agreement.  (Joint Ex. 16.)  LaBow testified that he attempted to negotiate reduced fees with Neuberger Berman by calling portfolio manager Marvin Schwartz once, on December

30, 2008, and that Schwartz told LaBow that the fees could not be reduced because doing would have an adverse ripple effect due to "Most Favored Nations" pricing clauses in Neuberger Berman's investment management agreements with other clients.  (Trial Tr. (LaBow) at 1032:3-15.)  LaBow also testified that he did not know whether he discussed Neuberger Berman's fees with SWI after December 30, 2008.  (Id. (LaBow) at 1034:10-12.)  Schwartz denied that he had discussed fees with LaBow regarding any account for SWI after the Combined Trust separation.  (See id. (Schwartz) at 1253:19-1254:16; 1254:23-1255:2.)

National City Bank became the custodial trustee of the Severstal Plans as of January 2, 2009.  (Pls. Ex. 212; Stip. ¶ 28; Trial Tr. (DiClemente) at 463:6-18.)  Jacqueline Thomas and Amanda Pierce, each a representative of National City Bank, received copies of the Severstal Investment Management Agreement from the Severstal Retirement Committee.  (Id.)  Thomas and Pierce each acknowledged in deposition testimony read into the record at trial that the Severstal Investment Management Agreement and other documentation received from SWI by National City gave National City sufficient information regarding WPN's authority as Investment Manager to enable National City to accept trade directions from LaBow or WPN.  (Deposition of Amanda Pierce ("Pierce Dep.") at 25:6-25:19, 30:1-30:14, 53:10-53:15, 60:1-60:23, 63:198-64:15, 104:2-104:22, 108:6-15, 108:14-25, 109:2-18, 110:2-7; Deposition of Jacqueline Thomas ("Thomas Dep.") at 15:22-16:2,  22:23-23:3, 23:21-24:24, 25:9-26:6, 26:13-26:18, 27:7-15.)

The credible evidence demonstrates that LaBow had investment authority to direct National City Bank to conduct transactions for the Severstal Plans.  SWI's Trust Agreement with National City Bank explicitly required National City to follow the instructions of an investment manager.  LaBow had been appointed as investment manager under the

Severstal Investment Management Agreement.  (Joint Ex. 7 ¶ 9.11; Joint Ex. 5 § 4.2(a); Joint Ex.

6 ¶ 8.110.)  LaBow claimed at trial that representatives of National City Bank refused to speak

with him regarding the Severstal Plans because they did not know him.  Pierce testified,

however, that she recognized LaBow as the investment manager of the Severstal Plans and that

he was authorized to give trade directions to National City Bank.  (E.g., Pierce Dep. at 25:6-19;

53:10-15, 63:9-64:15.)  Pierce further testified that she contacted LaBow to get "information to

set him up as a broker, investment manager for the account."  (Pierce Dep. at 49:22-24.)

Thomas also testified that she understood LaBow was the Severstal Plans' investment manager

and had authority to direct the investment of the Plans' assets.  (E.g., Thomas Dep. 15:22-16:2,

23:21-24:24, 25:9-26:6.)

The Severstal Retirement Committee Discovers that the Plans' Assets are Undiversified

On December 29, 2008, DiClemente received a report from Mercer Investment

Consultants ("Mercer"), an investment consultant to the Severstal Retirement Committee that

performed periodic portfolio reviews.  (See Pls. Ex. 82.)  At that point, DiClemente learned for

the first time, from Mercer rather than from LaBow, that the Neuberger Berman Account assets

were the only assets that LaBow had transferred to the Severstal Plans' trust.  (Id.; Trial Tr.

(DiClemente) at 447:12-20.)  DiClemente called Severstal Retirement Committee member

Dennis Halpin to inform him of what DiClemente had learned.  (Trial Tr. (DiClemente) at

448:4-15.)

Prior to December 29, 2008, neither LaBow nor WHX had informed DiClemente,

Halpin, or King that the Severstal Plans' trust had received only the Neuberger Berman Account

assets, or of the composition of the transferred assets.  (Id. (DiClemente) at 779:19-22; id.

(Riposo) at 118:8-11; id. (Halpin) at 835:7-15; id. (King) at 1081:17-21.)  As Mercer ordinarily

provided the Severstal Retirement Committee with its quarterly investment performance reports between sixty and ninety days after the end of each quarter, the Committee would not have received a report for the fourth quarter of 2008 until about March 2009.  (Id. (DiClemente) at 494:19-25.)  As of mid-December 2008, Severstal Retirement Committee attorney King had understood that part of the trust separation had been accomplished and that some of the assets transferred were being managed by Neuberger Berman.  (Id. (King) at 1130:18-23.)  The Severstal Retirement Committee had asked LaBow to provide statements of what assets were in the Severstal Plans' trust accounts in December 2008.  (Id. (King) at 1130:24-1131:1.)  However, King and the Severstal Retirement Committee did not receive copies of any statements from LaBow or anyone else before December 30, 2008.  (See id. (King) at 1131:2-10.)

On December 30, 2008, DiClemente and King held a conference call with LaBow.  (Joint Ex. 16; Pls. Ex. 82; Trial Tr. (DiClemente) at 632:6-8.)  The main topic of the call was the Severstal Retirement Committee's discovery that LaBow had transferred only the Neuberger Berman Account assets to the Severstal Plans.  (Trial Tr. (King) at 1090:15-21.)  The Committee expressed its concern that the assets transferred were entirely equity securities in the same volatile market sector and were not diversified.  (Id. (King) at 1090:25-1091:3.)  The Committee also expressed its belief that maintenance of the bulk of the Plans' assets in a single asset type violated the Severstal Plans' investment policy, which was the same as the policy governing the Combined Trust, and which the Severstal Retirement Committee had adopted as an interim measure before a new Severstal Plans' policy could be adopted.  (Id. (King) at 1091:3-7.)  In response, LaBow told the Committee that he had transferred only the Neuberger Berman Account assets because they were stocks that he could watch and liquidate easily.  (Id. (King) at 1091:8-11.)  On the December 30, 2008, call, LaBow also told DiClemente and King

that he could reallocate proportionally the assets of the Severstal Trust and the Combined Trust on a retroactive basis, by redistributing assets between the two trusts in proportion to their holdings while the Trusts were combined.  (Pls. Ex. 91; Trial Tr. (DiClemente) at 452:15-16; 634:25-635:4; 636:9-16; 681:11-14.)

The Severstal Retirement Committee Attempts to Reallocate or "Reset" the Portfolio

The Severstal Retirement Committee held a conference call with LaBow on January 7, 2009, with DiClemente and Halpin as Committee members and outside Committee counsel King present.  (Pls. Ex. 91.)  The Committee's purpose in undertaking the call was to discuss diversification of the Severstal Plans' assets, either by reallocating assets between the Severstal and WHX Trusts to recreate the portfolio that existed as of October 31, 2008, or implementing an alternative method of diversifying the Plans' holdings as soon as possible. (Trial Tr. (King) at 1096:9-16.)  LaBow admitted on the January 7, 2009, call that he was the one who had chosen which assets to transfer to the Severstal Plans.  (Id. (DiClemente) at 462:20-23; see Pls. Ex. 91 at 2 (noting LaBow admitted that "he chose to allocate the assets").)  LaBow did not express surprise that the Committee was alarmed by the allocation of the Neuberger Berman Account, nor did he claim that DiClemente or any other Severstal Retirement Committee member had agreed to receive only the Neuberger Berman Account assets before the transfer. (Trial Tr. (DiClemente) at 462:24-463:5.)  LaBow also identified several reasons, including concerns about the liquidity of the assets to be transferred and withdrawal limitations on certain funds held in the Combined Trust, as to why he could not reapportion or reset all of the funds in the Combined and Severstal Trusts to return the Severstal Trust to the same composition of assets it held before the November 3, 2008 transfer.  (Id. (DiClemente) at 460:21-461:31.)

During that call, the Severstal Retirement Committee asked LaBow to diversify by any means available if a "reset" to the October 31, 2008, portfolio allocation was not feasible. (See Trial Tr. (King) at 1096:20-1097:9.)  The Committee explicitly instructed LaBow to diversify the Severstal Plans' holdings by any means feasible and to "construct a more balanced diversified portfolio and . . . do everything he can to preserve value in making the transition from the Neuberger Berman (NB) portfolio."  (Pls. Ex. 91.)

The Committee held another conference call with LaBow on January 16, 2009, in which the Committee again requested that LaBow reset the portfolio retroactively in conjunction with the Combined Trust holdings to the extent feasible and, to the extent such a reset could not be achieved, provide a plan for reinvesting the portfolio in a manner consistent with the Combined Trust to diversify the investments of the Severstal Plans.  (See Pls. Ex. 103; Trial Tr. (DiClemente) at 472:23-473:14.)  On that call, LaBow identified four funds in the Combined Trust that he said the Severstal Plans could not invest in, but thereafter identified six funds that he said the Severstal Plans could invest in.  (Pls. Ex. 103 at 2.)  Although LaBow had previously told the Committee that the Severstal Plans could be reset to reallocate assets retroactively in conjunction with the Combined Trust, he now told the Committee that he did not think it could be done, and was not sure if it was legal to do so.  (Pls. Ex. 103.)  The Severstal Retirement Committee requested that LaBow create a writing identifying the investment funds that were in the Combined Trust into which the Severstal Plans could invest, and LaBow agreed.  (Id.) Finally, the Severstal Retirement Committee "emphatically" told LaBow that it "did not want Ron [LaBow] to take any action prior to providing the [Severstal Retirement Committee] with his formal [retroactive re]allocation plan, specifically stating 'don't act until you show us the allocation.'"  (Trial Tr. (LaBow) 1012:25-1013:9; Pls. Ex. 103.)

DiClemente testified credibly that LaBow's account of whether and how the Severstal Plans could be diversified was "an ever evolving story of what could or could not be done" that "seemed to change just about during every conversation" with the Severstal Retirement Committee.  (Id. (DiClemente) at 474:5-7.)  As DiClemente commented, it was "almost as if [LaBow] was doing his homework after the fact as opposed to having it done before."  (Id. (DiClemente) at 474:7-9.)  During the January 16, 2009, call, LaBow informed the Retirement Committee that, after he had chosen investments, the Retirement Committee "would not have an opportunity to assess [the investments] and ask him to re-do it once it's completed." (Pls. Ex. 103 at 2.)  In response, DiClemente, on behalf of the Committee, told LaBow that he needed to provide the Committee with a formal allocation plan for reinvesting in a diversified portfolio.  (Id.)  DiClemente noted that he believed that LaBow continued to have "responsibility once he determined what he wanted to do.  We just wanted to know what he wanted to do." (Trial Tr. (DiClemente) at 764:3-4.)  Halpin testified credibly that "everything we did, including this, was consistent with that [LaBow] had the authority exclusively."  (Id. (Halpin) at 851:7-18.)

As of January 2009, the Committee was attempting to impose greater oversight on LaBow's actions because LaBow had previously allocated only the Neuberger Berman Account to the Severstal Plans without telling them what he was doing.  (Id. (DiClemente) at 764:5-11; id. (Halpin) at 914:15-20.)  By referring to a formal allocation plan, the Severstal Retirement Committee was asking for specific details of the proposed investments "that would give [the Severstal Retirement Committee] comfort" about the "diversification" of the assets. (Id. (Halpin) at 852:3-5.)  DiClemente understood that the investment funds discussed during the January 16, 2009, call were precisely the same funds that were originally held in the Combined Trust.  (Id. (DiClemente) at 481:23-482:2.)  LaBow testified that he had referred to funds that

were somewhat different than those in the Combined Trust.  (Id. (LaBow) at 327:21-23; 330:20-23.)  LaBow did not, however, at any time explain to DiClemente the difference in the funds.  (Id. (DiClemente) at 482:3-5.)

At the time of the January 16, 2009, call, LaBow had not told the Retirement Committee that a complete retroactive reallocation of assets between the WHX and Severstal Plans would be impossible.  (Id. (DiClemente) at 770:14-16.)  In a January 20, 2009, letter, the Severstal Retirement Committee requested that LaBow provide a written plan to reinvest the Severstal Trust.  (Pls. Ex. 101.)  The letter requested that LaBow "(a) identify in writing those accounts that cannot or should not be proportionally allocated" between the Severstal Plans and the WHX Plans, "(b) provide the reason[s] for such treatment, and (c) indicate how you are recommending equitable allocation of those assets among the remaining (or substitute) investments."  (Id.)  DiClemente sent the letter to LaBow in order to get LaBow to put in writing which funds could and could not be reallocated between the WHX Plans and the Severstal Plans, and to identify alternative funds that could be used instead of the ones that were not available.  (See Trial Tr. (DiClemente) at 483:24-484:5.)  By "substitute" investments, the Committee was referring to investments that would constitute a diversified investment portfolio, but that had not been part of the Combined Trust before the November 3 transfer.  (Id. (DiClemente) at 477:9-15.)  The Committee hoped LaBow would provide a plan to diversify the Severstal Plans' assets, whether using the same or different investments as had existed in the Combined Trust before November 3, 2008.  (See id. (DiClemente) at 666:25-667:1.)  At no time, however, did LaBow provide the written plan the Committee requested in its January 20, 2009, letter.  (Id. (LaBow) at 294:21-24.)

The Severstal Retirement Committee held a further conference call with LaBow on January 26, 2009.  (Pls. Ex. 112.)  During this call, LaBow told the Committee that investment vehicles he had identified during the January 16, 2009, call as ones that could be used to reinvest the Severstal Plans' trust holdings could not be used.  (Pls. Ex. 112.)  It appears that LaBow had earlier referred to funds that were managed by the same entities but that held a different composition of assets.  In response, the Committee reiterated its request that LaBow diversify the Severstal Plans' trust "in a manner keeping the fund profile intact with regard to diversity of managers and investments."  (Id.)  The Committee also restated its request from January 16, 2009, that LaBow put in writing which investment funds could and could not be in the Severstal Plans' new portfolio, and LaBow again agreed to do so.  (Id.)

LaBow had not provided any plan for reinvesting the assets of the Severstal Plans' trust by February 4, 2009.  (Trial Tr. (DiClemente) at 772:11-15.)  LaBow sent a February 4, 2009, letter to the Severstal Retirement Committee, listing four funds in which the Severstal Plans might invest, but it was not the investment plan that the Committee had requested because it lacked any specificity with regard to diversification and composition percentages.  (See id. (Halpin) at 853:2-9; id. (King) at 1100:11-16, 1103:3-5; id. (Porten) at 1255:10-1356:9.)  In the February 4, 2009, letter, LaBow acknowledged that he had made the decision to transfer the Neuberger Berman assets, asserting that "I felt I had no other option given market conditions and the previous decline in energy shares [but] to transfer the Neuberger Berman account . . . ." (Joint Ex. 19.)  LaBow also stated that he would convert most of the Neuberger Berman Account to cash and invest it in four funds.  (Id.)  LaBow provided the Severstal Retirement Committee with no information about the composition of the proposed funds, whether they would constituted a diversified portfolio, the percentage of the Plans' assets that would be invested in

each, or when and how LaBow would execute the strategy.  The Committee was not requesting

Investment Plan information because LaBow needed formal approval from the Committee to act,

but because the Committee simply "wanted to understand the overall investment strategy" and

ensure that the Severstal Plans received a diversified portfolio, unlike the Neuberger Berman

assets.  (Id. (DiClemente) at 685:17-18, 685:6-12, 740:24-741:4; id. (Halpin) at 854:22-25.)

Even if the Severstal Retirement Committee approved LaBow's proposed allocation of the

Severstal Plans' funds, the Committee could not have acted on LaBow's proposal to invest in the

four funds without receiving more information about them and whether, taken together, they

constituted a diversified portfolio.  (See id. (DiClemente) at 486:6-12; 684:5-684:18.)

   The Committee held another conference call with LaBow on February 11, 2009.

(Pls. Ex. 122.)  During the call, LaBow identified two additional funds that had been in the

Combined Trust—"Sage" and "Procyon"—that he now claimed were unavailable to the

Severstal Plans, despite having previously told the Committee that they were available options.

(Compare Pls. Ex. 122 at 1 (Feb. 11 call representing Sage and Procyon unavailable) with Pls.

Ex. 103 at 2 (Jan. 16 call representing Sage and Procyon available); Trial Tr. (DiClemente) at

488:22-489:10.)  LaBow's statements about which assets the Severstal Plans could invest in on

the February 11, 2009, call and other calls with the Severstal Retirement Committee were

inconsistent with each other.  (See Pls. Ex. 122 ("Ron's inability to [invest the Plans' assets]

continues to change . . . . from 'being able to do it at the outset' to essentially not having any

ability to do it."); Trial Tr. (DiClemente) at 771:23-25; id. (Halpin) at 854:11-14 ("On each of

the calls there seemed to be a different answer each day.  There were pieces of a puzzle that

[LaBow] would have a difficult time actually putting together.").)

LaBow's inability to accomplish any retroactive reallocation of the assets between the Severstal Trust and the Combined Trust did not become fully apparent until February 17, 2009, when WHX CEO Glen Kassan informed the Severstal Retirement Committee that WHX would not accept the return of a proportional share of the Neuberger Berman Account.  (Pls. Ex. 129; Trial Tr. (Halpin) at 845:23-846:4; id. (DiClemente) at 774:7-15; id. (King) at 1106:13-16.)

Despite LaBow's failure to negotiate a fee reduction, on February 25, 2009, Halpin[3] signed the Neuberger Berman investment management agreement "in an effort to move the situation forward."  (Joint Ex. 20 at 2.)  DiClemente e-mailed a copy of the signed investment management agreement to Neuberger Berman along with the Severstal Investment Management Agreement, but noted that Halpin had not completed the portion of the investment management agreement regarding Neuberger Berman's fee because DiClemente thought that "LaBow may have discussed or will discuss with [Neuberger Berman] the fees for the account." (Pls. Ex. 136; Trial Tr. (DiClemente) at 506:5-16.)

LaBow's Disingenuous Claims of Inability to Act

LaBow asserted at trial that he was not able to liquidate, or otherwise manage, the Neuberger Berman Account assets during the relevant period absent the Severstal Retirement Committee's execution of an investment management agreement with Neuberger Berman, and that the failure to enter into such an agreement and effect a liquidation during the Winter of 2008

---

[3]     DiClemente left the Severstal Retirement Committee in early February 2009, and thereafter, Halpin was the sole remaining member of the Severstal Retirement Committee.  (Id. (DiClemente) at 498:25-499:4; id. (Halpin) at 833:23-25.) DiClemente remained involved with the Severstal Retirement Committee as a consultant only.

to 2009 was the result of the Committee's inaction.  The Court finds LaBow's attempt to shift

blame to the Severstal Retirement Committee disingenuous, because the Committee was

awaiting a coherent response from him on the issue of elimination of duplicative management

fees from the proposed agreement, as King had highlighted in December 2008, and LaBow did

not explore other simpler means of facilitating liquidation and reinvestment such as the

establishment of a basic brokerage account or bank trading link.

   Although LaBow testified that, prior to March 24, 2009, the lack of a "trading

link" rendered him unable to manage the assets, LaBow himself did nothing to facilitate opening

a "trading link" with National City Bank.  (Trial Tr. (DiClemente) at 775:9-11.)  Moreover,

LaBow never asked the Severstal Retirement Committee to provide WPN with a "trading link"

account connected to National City Bank.  (Id. (DiClemente) at 756:14-16.)  There is no reason

that LaBow could not have established a trading link before March 24, 2009.  (Id. (DiClemente)

at 775:16-18.)  Moreover, LaBow never told Halpin that the Committee had to do anything

specific to give LaBow authority to sell the Neuberger Berman Account assets after Halpin had

signed the investment management agreement with Neuberger Berman.  (Id. (Halpin) at 863:24-

864:2.)

   LaBow admitted at trial that it was not necessary to use Neuberger Berman as a

broker to liquidate the Neuberger Berman Account assets, and that any broker could have been

used.  (Trial Tr. (LaBow) at 315:22-316:5.)  Furthermore, each witness from National City Bank

testified that the bank recognized LaBow's authority and would have accepted investment

directions given by him.  (Pierce Dep. at 25:6-25:19, 30:1-30:14, 53:10-53:15, 63:198-64:15,

104:2-104:22; Thomas Dep. at 15:22-16:2, 22:23-23:3, 23:21-24:24, 26:13-26:18.)  National

City's Trust Agreement with SWI authorized National City to carry out any directions from

LaBow.  (Joint Ex. 5 § 4.2(a); <u>see also</u> Trial Tr. (Porten) at 1431:21-25.)

        LaBow's testimony that he spoke to an unspecified person at Neuberger Berman

on March 24, 2009, who told him that he could not give the instruction to liquidate the Severstal

Plans' assets and that Dennis Halpin had to give that instruction is not credible.  (<u>See</u> Trial Tr.

(LaBow) at 1001:20-1002:6.)  Marvin Schwartz, LaBow's friend and longtime business

associate, testified that LaBow gave the instruction.  (<u>Id.</u> (Schwartz) at 1258:18-20.)  Schwartz

understood in March 2009 that LaBow had the authority to manage and liquidate the assets in the

Severstal Plans' trust.  (<u>Id.</u> (Schwartz) at 1259:1-3.)  The Court credits Halpin's testimony that

he did not give the instruction.  (<u>Id.</u> (Halpin) at 868:9-12.)  It is undisputed that the assets were

liquidated on March 24, 2009, and there is no contention that anyone other than LaBow or

Halpin gave the instruction.  LaBow left telephone messages for both King and Halpin on March

23—the day before the assets were liquidated—stating that he would shortly be liquidating the

assets and acknowledging that he had sole responsibility for the investments.  (<u>See</u> Pls. Exs. 145,

154.)  Halpin testified that he did not remember any confirmation call from Neuberger Berman.

The preponderance of the credible evidence proves that LaBow gave the instruction to liquidate

the Severstal Plans' Neuberger Berman Account assets on March 24, 2009, and that he

understood at all relevant times that he had sole investment authority and responsibility for the

Severstal Trust assets.

        Despite LaBow's assertions that he lacked authority to complete the trade of the

Neuberger Berman Account assets, the Court credits Schwartz's testimony that, on March 24,

2009, LaBow instructed Neuberger Berman to sell the assets and the Neuberger Berman Account

assets were finally converted them to cash and cash equivalents.  (<u>See</u> Stip. ¶ 39; Pls. Exs. 145,

154; Trial Tr. (Schwartz) at 1275:20-22, 1277:1-9.)  No member or representative of the

Severstal Retirement Committee instructed LaBow or Neuberger Berman to sell the assets on

March 24, 2009.  (Trial Tr. (LaBow) at 1056:6-7.)

A Prudent Investment Manager Would Have Taken
Proactive Steps to Overcome Logistical Obstacles

        Plaintiffs established, through the credible testimony of their fiduciary expert,

Charles Porten, that a prudent fiduciary would have raised clearly with the other named

fiduciaries any impediments arising from a perceived lack of authority that a custodian of

Severstal Plan assets had asserted.  Porten testified that, even if LaBow's authority was not

recognized by a bank or other service provider, an investment advisor would normally test

authority and, if a trustee failed to recognize that authority, LaBow "should have gone back to

Severstal and said that, I'm responsible to achieve diversification.  You're not letting me do it

for these reasons.  Now, either you want me to achieve diversification, which is my

responsibility, or you don't.  If you do, then do the necessary.  If you don't, find someone else."

(Id. (Porten) 1353:2-14.)

        At trial, LaBow attempted to justify his inattention to his investment advisory

authority and responsibilities by claiming that he could not have formulated an investment plan

because the Severstal Retirement Committee had not provided him with an investment policy.

This testimony is counter-factual.  King testified credibly that the Severstal Retirement

Committee had adopted the pre-existing WHX policy, under which Defendants had been

operating in connection with the Combined Trust, as an interim measure and had at a minimum

implicitly communicated this to LaBow when they instructed him to replicate the WHX portfolio

if he could not arrange a retroactive reallocation.  (Trial Tr. (King) at 1091:3-7).  Furthermore,

King and Plaintiffs' fiduciary expert, Porten, both testified credibly that diversified portfolios can be constructed in the absence of formal investment policies.  As Porten testified, investment managers are able to provide investment plans even in the absence of a formal investment policy.  (Id. (Porten) at 1358:1-7.)  King, who has advised over 50 ERISA-covered pension plans as an ERISA practitioner and provided advice on their investment policies from an ERISA compliance standpoint, testified that investment managers themselves often provide investment policies if the plans they manage do not have one.  (Id. (King) at 1101:10-14.)  A plan without a formal investment policy could nevertheless have a diversified portfolio.  (Id. (King) at 1101:15-20.)

Plaintiffs demonstrated that LaBow should have, at minimum, presented a plan for diversification after the November 3, 2008, transfer, communicated a process for accomplishing that diversification and, if the Severstal Retirement Committee failed to follow his advice, he should have communicated clearly that it was unacceptable to do nothing to diversify the Plans' assets and, if necessary, resigned.  While WPN remained investment manager, Defendants were responsible for the product and diversified investment of the Severstal Plans' assets.  The governing documents did not give Defendants the option of abdicating responsibility to the Severstal Retirement Committee.

Events Following Liquidation of the Neuberger Berman Account Holdings

On April 29 or 30, 2009, Halpin left the Severstal Retirement Committee and a new Committee was formed.  (Stip. ¶ 5; see Trial Tr. (Halpin) at 833:4-6.)  By May 4, 2009, the Committee consisted of Vincent Assetta, Drew Landon, and Timothy Rogers.  (Stip. ¶¶ 6-8.)

The new Severstal Retirement Committee did not immediately step in to reinvest the Severstal Trust's assets because it wanted to give LaBow another chance to provide an investment plan.  (Trial Tr. (Rogers) at 1282:11-16.)  On behalf of the Committee, Assetta sent a letter to LaBow on May 5, 2009, expressing the Committee's concern that the Trust remained entirely invested in cash and cash equivalents, and reiterating the Committee's standing request that LaBow present a plan to diversify the Trust's assets.  (Joint Ex. 23; Trial Tr. (Landon) at 35:7-24.)  At the time LaBow liquidated the Severstal Plans' assets, he still had not given the Severstal Retirement Committee any formal plan for investment of the Plans' assets.  (Id. (Halpin) at 869:10-14.)  LaBow responded by stating that he intended to invest the Trust in a portfolio consisting entirely of mortgage-backed securities.  (Id. (Landon) at 35:7-24.)  LaBow did not provide this recommendation in the form of an investment plan; instead, he gave the Severstal Retirement Committee a copy of an SEC filing describing certain mortgage-backed securities.  (See id. (LaBow) at 317:2-16.)  At trial, Porten testified credibly that a portfolio consisting entirely of mortgage-backed securities is not a diversified portfolio according to investment industry standards.  (Trial Tr. (Porten) at 1359:3-6.)

In mid-May of 2009, the Committee held a meeting to discuss the Severstal Plans' lack of diversification and LaBow's proposed portfolio of mortgage-backed securities. The Committee concluded at this meeting that LaBow's proposal did not constitute a diversified portfolio because it was concentrated entirely in one category of assets——mortgage-backed securities.  (Id. (Landon) at 36:14-15; id. (DiClemente) at 749:23-25; id. (Rogers) at 1281:14-19.)  Because LaBow had not diversified the Severstal Trust or presented a plan for doing so, the Committee fired LaBow and WPN as investment manager and engaged Mercer as investment consultant to recommend a method of diversifying the Severstal Trust assets.  (Id.

(Landon) at 36:9-11; id. (Rogers) at 1281:17-19, 1285:23-1286:2.)  In a letter dated May 19,

2009, the Severstal Retirement Committee notified WPN that it intended to terminate it as

investment manager, but invited a response.  (Joint Ex. 24.)  In a letter responding to the

Severstal Retirement Committee's notice, LaBow cited his previous proposal to invest solely in

mortgage-backed securities and the performance of the Combined Trust prior to the trust

separation.  (Pls. Ex. 156; Trial Tr. (LaBow) at 324:7-18.)  In this letter, LaBow did not claim

that he lacked adequate authority, or had been prevented from exercising authority, to manage

and diversify the Severstal Plans.  (Id.)  After March 24, 2009, LaBow never provided the new

Severstal Retirement Committee with any plan of investment other than his proposal to invest

solely in mortgage-backed securities.  (Trial Tr. (Landon) at 35:25-36:2.)  Upon firing

Defendants, the new Committee requested that its investment oversight consultant, Mercer,

recommend a diversification strategy.  On July 16, 2009, a strategy recommended by Mercer

was implemented.  (Pls. Ex. 216 (July 2009 Statement); Trial Tr. (Landon) at 39:20-22; id.

(Rogers) at 1283:8-15.)

The Severstal Plans' Damages

After the March 24, 2009, liquidation, the Severstal Trust remained invested

entirely in cash and cash equivalents.  (Joint Ex. 22.)  Following Defendants' termination as

investment managers by the Severstal Retirement Committee in May 2009, the Severstal

Retirement Committee began consulting with Mercer to allow Mercer time to develop its

investment proposal for a diversified portfolio for the Severstal Plans' assets.  The Severstal

Retirement Committee moved with appropriate speed in consulting with Mercer in early June

2009, and received Mercer's final recommendation for a diversified portfolio on or about July 8,

2009.

Mercer recommended an initial allocation of 38 percent equity securities, 35 percent bond securities, and 27 percent cash.  (Pls. Ex. 158.)  Mercer recommended that this initial allocation then be reinvested 50 percent in equity securities, 45 percent in bonds, and 5 percent in cash, an allocation that would be accomplished with three institutional class funds managed by the Vanguard Group, Inc.  (Id.)  On July 16, 2009, the strategy recommended by Mercer was implemented.  (Pls. Ex. 216.)  From November 3, 2008 through July 15, 2009, while the Severstal Trust assets remained in the undiversified portfolio or in cash, the Trust had lost approximately $4.7 million in value,[4] resulting in $32.9 million in trust assets remaining.  (Pls. Ex. 205.)

Porten identified four alternative investment portfolios that would have constituted suitable diversified, prudent portfolios in which the Severstal Plans' assets could have been invested between November 3, 2008, and July 16, 2009.  (See Trial Tr. (Porten) at 1311:13-1365:11.)

Mark Berenblut, Plaintiffs' expert economist, calculated and testified as to the performance of the Severstal Plans' actual investments in relation to the returns they would have achieved had they been invested in the alternative benchmark portfolios identified by Porten.  (See id. (Berenblut) at 1473:1-8, 1481:18-19.)  Berenblut's calculations of the Severstal Plans' performance took into the account receipts and disbursements of contributions and distributions and fees accrued by WPN Corporation.  (Id. (Berenblut) at 1473:8-12.)  His calculations also accounted for the transfer of approximately $6 million in cash and cash equivalents from the Combined Trust to the Severstal Trust in March 2009, as part of a final reconciliation of the

---

[4] This loss figure reflects adjustments for receipts, disbursements and a further final cash transfer from the Combined Trust in the November 2008 to July 2009 period.

amounts owed to SWI.  (See id. (Berenblut) at 1479:4-6, 1479:9-11.)  Berenblut's conclusions

were also presented as summary exhibits in the form of charts.  (See Pls. Exs. 205-205C, 217,

223.)

   The first portfolio identified by Mr. Porten consists of a 55-60 percent equity,

35-40 percent bond, 5 percent cash split ("60% Equity and 40% Fixed Income Portfolio").  (Trial

Tr. (Porten) at 1360:14-24.)  The equity component is benchmarked against the Standard &

Poor's 500 index, and the bond component against the Barclay's aggregate index.  (Id. (Porten)

at 1361:2-6.)  When the portfolio is being created for an older population, like the beneficiaries

of the Severstal Plans, it is standard industry practice for the portfolio to be weighted slightly

more heavily in favor of fixed income assets.  (Id. (Porten) at 1361:9-15.)  If the Severstal Plans'

assets had been invested in the 60% Equity and 40% Fixed Income Portfolio on November 3,

2008, the trust would have had a value of $38.8 million by July 15, 2009, with an additional

return of $5.9 million over the Severstal Trust's actual investment results, excluding pre-

judgment interest.  (Joint Ex. 205; Pls. Ex. 223.)

   Alternatively, the Severstal Plans could have been invested in a portfolio that

duplicated the composition or replicated the performance of the Combined Trust's investments

("WHX Portfolio").  (Trial Tr. (Porten) at 1362:6-12, 17-19, 1364:23-1365:5.)  Even if the

Severstal Plans could not have received a percentage of the assets held in the Combined Trust as

part of the Trust separation, the Plans could have been invested in assets that would have

replicated the performance of those assets.  (Id. (Porten) at 1364:23-1365:5.)  If the Severstal

Plans' assets had been invested in the WHX Portfolio on November 3, 2008, the trust would

have had a value of $42.5 million by July 15, 2009, with an additional return of $9.6 million over

the Severstal Trust's actual investment results.  (Joint Ex. 205; Pls. Ex. 223.)

The Severstal Plans also could have been invested beginning on November 3, 2008, in the portfolio recommended by Mercer Investment Consultants in June 2009 ("Mercer Portfolio") (Trial Tr. (Porten) at 1362:20-1363:2.)  That portfolio consisted of an initial asset allocation of 38 percent equities, 35 percent bonds, and 25 percent cash and cash equivalents. (Id. (Porten) at 1363:11-15.)  Over the longer term, the portfolio consisted of 50 percent equities, 5 percent cash, and 45 percent bonds.  (Id. (Porten) at 1363:21.)  If the Severstal Plans' assets had been invested in the Mercer Portfolio on November 3, 2008, the trust would have had a value of $40.5 million by July 15, 2009, an additional return of $7.7 million over the Severstal Trust's actual investment results.  (Joint Ex. 205; Pls. Ex. 223.)

Finally, the Severstal Plans could have been held in cash for a brief period before investing in the Mercer Portfolio ("Mercer Initial Cash Portfolio").  (See Trial Tr. (Porten) at 1364:1-13.)  If the Severstal Plans' assets had been invested in the Mercer Initial Cash Portfolio on November 3, 2008, the trust would have had a value of $41.5 million by July 15, 2009, an additional return of $8.6 million over the Severstal Trust's actual investment results.  (Joint Ex. 205; Pls. Ex. 223.)

## II.
### CONCLUSIONS OF LAW

Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a), provides that "[a] civil action may be brought . . . by a . . . fiduciary for appropriate relief under section 1109 of this title." Section 1109 provides, in relevant part, that:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the

fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C.S. § 1109(a) (LexisNexis 2011).

Plaintiffs have proven by a preponderance of the evidence that Defendants breached their fiduciary duties with respect to the Severstal Plans, and that those breaches caused damages to the funds.  Defendants, who were fiduciaries of the Severstal Plans both before and after the separation of those plans' assets into the Severstal Trust, breached their duties imposed by Section 404 of ERISA by failing to make appropriate arrangements for the management of the Severstal Trust before the trust separation and failing to act prudently in the rendering of advice, management and diversification of the assets in the Severstal Trust after the trust separation.

Defendants were Severstal Plan Fiduciaries Before, During and
After the November 3, 2008 Asset Transfer

Defendants were fiduciaries of the Severstal Plans prior to, during, and after the trust separation on November 3, 2008, because they provided investment advice for a fee.  Under the Second Amendment to the WHX Investment Management Agreement and the Severstal Investment Management Agreement they had, but did not fulfill discretionary investment management authority and responsibilities as well.

ERISA's definition of a fiduciary focuses on the function or duties performed by an individual or entity, rather than merely on the title held by an individual or entity.  Blatt v. Marshall and Lassman, 812 F.2d 810, 812 (2d Cir. 1987).  Thus, a person is a fiduciary of an ERISA-governed pension plan regardless of whether he is a named fiduciary, if:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee

> or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C.S. § 1002(21)(A) (LexisNexis 2011).

Plaintiffs argue that Defendants were plan fiduciaries under all three subdivisions of Section 1002(21)(A). For purposes of resolving Plaintiffs' fiduciary breach and damages claims in this action, it suffices for this Court to address their contention that Defendants were fiduciaries within the meaning of subdivision 1002(21)(A)(ii) at all relevant times.

Under the plain language of the statute, responsibility for providing investment advice for a fee is sufficient to give rise to ERISA plan fiduciary status. See 29 U.S.C § 1002(21)(A)(ii). Courts have, furthermore, found that an investment advisor owes fiduciary duties to an ERISA plan where the advisor was "(1) providing individualized investment advice; (2) given pursuant to a mutual understanding; (3) on a regular basis; (4) that serves as a primary basis for investment decisions with respect to plan assets; (5) pertains to the value of the property or consists of recommendations as to the advisability of investing in certain property; and (6) is rendered for a fee." Goldenberg v. Indel, Inc., 741 F. Supp. 2d 618, 627 (D.N.J. 2010) (citing 29 C.F.R. § 2510.3–21(c)).

In its memorandum order entered in this case on April 11, 2014, the Court granted partial summary judgment to Plaintiffs, finding that Defendants were, at relevant times, persons who, "render[ed] investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or ha[d] any authority or responsibility to do so." 29 U.S.C. § 1002(21)(A)(ii); Severstal Wheeling, Inc. v. WPN Corp., No. 10CV954, 2014 WL 2959014, at *7 (S.D.N.Y. Apr. 11, 2014). The trial evidence confirmed that

Defendants were responsible for rendering investment advice for a fee with respect to the

Severstal Plans both prior to the November 3, 2008, transfer of assets and at all times through

May 19, 2009.   In addition, Section 3(38) of ERISA, 29 U.S.C. § 1002(38), provides that an

"investment manager" is a fiduciary who has the power to "manage, acquire, or dispose of any

asset of a plan," is a registered investment advisor under the Investment Advisors Act, and has

acknowledged its fiduciary status with respect to the plan in writing.   The Second Amendment to

the WHX Investment Management Agreement provided that WPN would be paid a fee of 90

basis points per year on the value of the Combined Trust.   The Severstal Investment

Management Agreement incorporated the Second Amendment and likewise specified 90 basis

points per year as the fees for the Defendants' services as Investment Manager.   In that

agreement, WPN represented and warranted that "all actions taken by [WPN] under this

Agreement shall be in accordance with ERISA and [WPN] acknowledges that it is a fiduciary

acting within the scope of an investment manager under Section 3(38) of ERISA."  (Joint Ex. 4

at 4.)

   The trial evidence proves that Defendants were contractually obligated to, and in

fact did, render investment advice to the Combined Trust and the Severstal Trust.  LaBow was

the only advisor to whom the WHX Committee looked with respect to the determination of

which assets would be kept by the Combined Trust, which assets would be transferred into the

Severstal Trust, and as to the timing of that transaction.   Indeed, there is no evidence that the

WHX Committee ever failed to follow LaBow's advice.   The trial evidence also proves that SWI

expected, and LaBow had agreed, that Defendants would continue to be the Severstal Plans' paid

investment manager following the transfer, an agreement that was confirmed in writing in the

Severstal Investment Management Agreement, which LaBow himself backdated to November 1,

2008.  In fact, at trial, LaBow repeatedly acknowledged that he had a duty to give investment advice to the Severstal Plans and also admitted that he was a fiduciary to the Plans.

**Defendants Breached their Fiduciary Duties to the Severstal Plans in Designating an Undiversified Portfolio for Transfer**

Defendants, as fiduciaries, were subject at all relevant times to the duties imposed by Section 404(a) of ERISA, 29 U.S.C. § 1104(a), in performing their investment-related duties to the Severstal Plans pursuant to the authority granted to them by the Second Amendment and the Severstal Investment Management Agreement.  Section 404(a) provides in pertinent part that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interests of the participants and beneficiaries and –
>
> (A)    for the exclusive purpose of:
>
>    (i)    providing benefits to participants and their beneficiaries; . . .
>
> (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;
>
> (C)    by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>
> (D)    in accordance with the documents and instruments governing the plans insofar as such documents and instruments are consistent with the provisions of this title . . . .

29 U.S.C.S. § 1104(a) (LexisNexis 2011).

Accordingly, Defendants were obliged to comply with their Section 404(a) fiduciary duties insofar as they advised and managed the selection of assets for transfer and agreed to continue to manage the Severstal Trust following the transfer.  The trial evidence proves that Defendants selected the Neuberger Berman Account, rather than a proportional portfolio of Combined Trust assets or cash, for transfer to the Severstal Trust and directed that transfer to occur.  LaBow made this direction despite knowing that the Severstal Retirement Committee understood that the transfer would be composed of a pro rata share of the assets of the Combined Trust, and knowing that the Severstal Plans had no mechanisms in place to liquidate the Neuberger Berman Account securities holdings.  Defendants could have liquidated the securities prior to transfer, if holding cash was in the best interests of the Severstal Plans, and there was no credible evidence demonstrating it would not have been possible to transfer at least a substantial portion of the Combined Trust assets in kind, even if advance notice would have been required and the transfer delayed.

Having chosen to transfer an undiversified portfolio of energy-sector stocks and having agreed to continue as investment manager following the transfer, Defendants had a duty to ensure that those assets would be managed with "care, skill, prudence and diligence."  29 U.S.C.S. § 1104(a).  Although the mere transfer of an undiversified portfolio may not be a breach of fiduciary duty, creating such a transfer under circumstances in which the transferee plan would have to hold them indefinitely absent the creation of new trading arrangements and/or prompt and decisive use of Defendants' investment management authority, and subsequently failing to take any effective action to liquidate and diversify the portfolio to minimize the risk of large losses with respect to those transferred assets, was imprudent.  See e.g., Leber v. CitiGroup, Inc., No. 07CV9329, 2011 WL 5428784, at *4 (S.D.N.Y. Nov. 8, 2011)

(recognizing ongoing duty of ERISA fiduciary to monitor investments and dispose of any that become improper).

Here, despite knowing that the volatile assets transferred to the Severstal Trust would require immediate and active management, Defendants directed the transfer with the knowledge that Neuberger Berman was not going to be managing the assets and also failed to make arrangements prior to the transfer for the ongoing prudent management of the assets.  See Chao v. Merino, 452 F.3d 174, 182 (2d Cir. 2006) (a fiduciary aware of a risk to the fund may be liable for failing to protect the fund from that risk).  Nor did Defendants promptly bring to the attention of the Severstal Committee the need for immediate action with respect to transferred assets, despite knowing that the Committee had expected that a diversified pool of assets would be transferred.  Defendants' failure to make a portfolio transfer selection that was prudent under the circumstances, combined with Defendants' failure to communicate clearly to the Severstal Committee the nature of the portfolio and the urgent need for attention to its liquidation and management, fell far short of Defendants' contractual duties to render investment advice and manage the Severstal Plans' assets "with the care, skill, prudence and diligence under the circumstances that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims."  (See Trial Tr. (Porten) 1353:2-14.)

Defendants Breached their Duties to the Severstal Plans by Failing
to Recommend and Implement a Diversified Portfolio after November 3, 2009

The assets of the Severstal Trust, which were concentrated in eleven energy-sector stocks until Defendants liquidated those stocks on March 24, 2009, were undiversified as of the November 3, 2008 transfer and remained undiversified until July 16, 2009.  See Babcock

ex rel. Computer Assocs. Int'l., 186 F. Supp. 2d 253, 263 (E.D.N.Y. 2012) (diversification is

lacking where investments representing a large percentage of plan assets were invested in a

single vehicle).  ERISA Section 404(a)(1)(C) requires fiduciaries to "diversify[] the investments

of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly

prudent not to do so." 29 U.S.C. § 1104(a)(1)(C) (LexisNexis 2011).  "Once the plaintiffs have

established a prima facie case of failure to diversify, the burden of persuasion shifts to

defendants to show that the investments at issue were nevertheless 'clearly prudent' under the

circumstances." Liss v. Smith, 991 F. Supp. 278, 301 (S.D.N.Y. 1998) (citing Reich v. King,

867 F. Supp. 341, 343 (D. Md. 1994); Lanka v. O'Higgins, 810 F. Supp. 379, 386-87 (N.D.N.Y.

1992)).  Plaintiffs have carried their prima facie burden, and Defendants have failed to show that

leaving the Neuberger Berman assets unmanaged was "clearly prudent" under the circumstances.

      Defendants also breached their fiduciary responsibility to carry out their duties in

accordance with the Plans' governing documents.  Because the Severstal Investment

Management Agreement, which gave Defendants sole investment management authority over

the Severstal Trust assets, and the Severstal Trust Agreement, which gave Defendants authority

to direct the Trustee, were effective at the time of the transfer, Defendants at all times after the

transfer and until they were fired possessed the authority to manage the assets within the

Severstal Trust and thus were obliged to exercise those powers to fulfill the duty to diversify the

assets contained therein.  The credible evidence at trial demonstrated that Defendants had

management authority, as granted by the Severstal Trust Agreement, to direct the investments

with respect to the Severstal Trust.   (Joint Ex. 1 at 3; see Joint Ex. 2 at 4; Joint Ex. 4 at 4.)  This

conclusion is supported by the plain language of the agreement, the credible testimony of

National City Bank representatives that they would have recognized LaBow's authority, and by

LaBow's own testimony concerning his initial attempts to exercise his authority.   Furthermore, even if his attempts to give instruction were truly rebuffed by Citibank or National City Bank, LaBow should have promptly informed the Severstal Committee and taken steps to remedy the problem, which he did not.

Even assuming, arguendo, that LaBow merely possessed investment advisory authority and could not have directly effectuated the liquidation of the Severstal Trust assets, he nonetheless failed to fulfill his fiduciary duties as an investment advisor.  Following the Committee's discovery of the undiversified nature of the assets, Defendants failed to prepare a specific plan for diversification as requested by the Committee, in addition to failing to manage or diversify the assets directly.  To the extent that LaBow mentioned potential investment vehicles over the course of time, he did not provide details or give a coherent explanation of the role that the investments would play in an overall diversified investment strategy for the Severstal Trust.  LaBow's ever-shifting representations with respect to whether a "reset" of the Combined Trust-Severstal Trust asset division was feasible, along with his failure to ever present the Committee with a detailed diversified investment plan, not only fell short of Defendants' investment management duties under the Severstal Trust Agreement, but of Defendants' advisory duties as well.

LaBow's complaints regarding the Committee's actions and inaction, such as not immediately liquidating the assets and/or signing an agreement with Neuberger Berman, are largely irrelevant to Defendants' independent responsibility to fulfill their duties under ERISA. As explained above, Defendants were fiduciaries with respect to the Severstal Trust pursuant to the Severstal Management Agreement, which gave them sole investment responsibility for the Severstal Trust in the absence of an effective appointment of another manager and obliged them

to perform their duties in a manner consistent with the investment policies established by the Severstal Retirement Committee.  "ERISA was deliberately structured so that legal responsibility for management of ERISA plans would be clearly located" and as such, "[u]nder ERISA, an investment manager's fiduciary obligations may not be turned on and off like running water."  Lowen v. Tower Asset Mgmt, Inc., 829 F.2d 1209, 1219 (2d Cir. 1987).  As the Second Circuit explained more than 25 years ago:

> ERISA contemplates that after management authority over plan assets is delegated to an investment manager under Section 402(c)(3), the manager becomes a fiduciary to the plan and not merely the instrument by which the investment whims of [other fiduciaries] are carried out with unquestioning obedience . . . .  The fiduciary obligations of an investment manager to a plan require it to exercise independent judgment and to ensure that the investments of assets entrusted to it are based on such judgments.  ERISA's purpose of clearly locating legal obligations will be vitiated if plaintiffs are required to engage in an after-the-fact sorting-out of actions, statements and states of minds among possible fiduciaries to determine which is legally responsible."

Id. (footnote omitted).  No claims have been asserted against other Severstal Plan fiduciaries in this action, and any fault on their part does not relieve Defendants of legal responsibility for losses caused by their own breaches of duties imposed by ERISA.

   Ensuring the prudent management of a properly diversified portfolio was Defendants' responsibility, regardless of the Committee's actions in this case.  Cf. Koch v. Dwyer, No. 98 Civ. 5519, 1999 WL 528181, at *10 (E.D.N.Y. Jul. 22, 1999) (directed trustee not free from liability where knowingly following imprudent directions of another fiduciary).

Furthermore, LaBow's actions belie his suggestion that the Committee somehow undermined his genuine efforts to fulfill his fiduciary duty, either as an investment advisor or manager.  LaBow failed to communicate to the Committee key information that the transferred assets were undiversified, despite his knowledge that the Committee had been led to expect a proportional transfer.  And if, as LaBow contends, bank representatives refused to deal with him, he never conveyed that information to the Committee, and he did not request the Committee take action to remedy the issue.  Relatedly, LaBow did not explain clearly the reason why he insisted that the Committee needed to retain Neuberger Berman as an additional investment manager despite the agreement that was already in place with WPN.  Finally, Defendants at no point indicated that they were prepared to resign in reaction to any actions the Committee was taking that Defendants now claim were improper, and they indeed did not resign.  Defendants thus continued to have investment management responsibility and liability pursuant to the Severstal Trust Agreement until they were terminated by the Committee in May 2009.

Over the period in which Defendants failed to take any effective action to liquidate and reinvest the Neuberger Berman Account portfolio, the value of the Severstal Plans' assets declined by $4.7 million, after adjustment for additions and withdrawals during the period. By contrast, the Combined Trust portfolio, which Defendants continued to manage actively, rose by a net thirteen percent during the same period.  Had the Severstal Plans' assets remained in the Combined Trust, they would likely have been valued at $42.5 million by July 15, 2009.  Through their inaction and refusal to comply with the Committee's instructions and requests, and their failure to even advise the Committee clearly that they were abdicating their responsibilities and that measures had to be taken to protect the Plans, Defendants breached their ERISA-imposed fiduciary duties to carry out their investment management and advisory responsibilities,

diversify investments, act in the best interests of participants and beneficiaries, and perform their fiduciary duties in accordance with the provisions of the governing plan documents.

The Court finds that Defendants were in breach of their fiduciary duties to the Severstal Plans under Section 404(a) of ERISA from November 3, 2008, through their termination by the Severstal Retirement Committee on May 19, 2009.  WPN and LaBow were both fiduciaries, with coextensive responsibilities and liability, since LaBow was WPN's principal and only investment professional, and the investment management agreements specifically called for LaBow to perform WPN's investment management duties.  In light of the Court's determination on Plaintiffs' Section 404(a) claim, it is unnecessary for the Court to address Plaintiffs' claim under ERISA Section 406, 29 U.S.C. § 1106.

Damages - Loss Causation

"Section 1109 [of ERISA] provides that a fiduciary who has breached a duty owed to a plan is liable for 'any losses to the plan resulting from each such breach.'"  Dardaganis v. Grace Capital Inc., 889 F.2d 1237, 1243 (2d Cir. 1989).

The Court finds that the losses suffered by the Severstal Plans between November 3, 2008 and July 16, 2009, the date on which the Committee had the Mercer proposal implemented, are properly chargeable to Defendants.  Defendants remained the Investment Manager of the Severstal Plans pursuant to the Severstal Investment Management Agreement and retained authority and responsibility for the prudent management of a diversified Severstal Trust through May 2009.  The evidence further proves that, due to Defendants' failures, the Severstal Retirement Committee could not have acted more quickly after the termination of WPN to diversify the Severstal Plans' assets because it had to consult with Mercer in order to develop a diversified portfolio investment strategy.

Losses are measured by the difference in how the plan in question performed and how the plan would have performed had it been invested like "other funds being invested during the same period in proper transactions." Donovan v. Bierwirth, 754 F.2d 1049, 1056 (2d Cir. 1985). "Where several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these" and "[t]he burden of proving that the funds would have earned less than that amount is on the fiduciaries found to be in breach of their duty." Id. In calculating damages caused by a breach, the district court should presume that "but for the breach, the Fund would have earned even more than it actually earned, [and that] there is a 'loss' for which the breaching fiduciary is liable." Dardaganis, 889 F.2d at 1243. Any "uncertainties in fixing damages will generally be resolved against the wrongdoer." Id. at 1244 (finding defendants did not overcome the presumption).

The evidence presented at trial proves that the Severstal Plans would have earned substantially higher returns had Defendants not breached their fiduciary duties to the Plans. During the time Defendants were in breach of their fiduciary duties, the Severstal Plans' assets remained in an undiversified portfolio and the Plans experienced a decline in value of approximately $4.7 million, or 12.5 percent. (Pls. Ex. 205.)

The uncontroverted evidence demonstrates that the Combined Trust, which Defendants continued to manage throughout the period in question, earned substantial returns and that, had the Severstal Trust assets been invested through July 15, 2009, in a manner consistent with the strategy of the Combined Trust, the Severstal Trust would have experienced a net gain of $9.6 million. Although Defendants proffered general, uncorroborated testimony by LaBow that at least some of the specific Combined Trust investments would have been unavailable to the Severstal Trust, LaBow also acknowledged, and other witnesses and

documents confirmed, that he had at times advised the Severstal Retirement Committee that investments comparable to those in which the Combined Trust was invested could have made for the Severstal Trust.

On this record, Plaintiffs have carried their burden of demonstrating that the Court may properly presume that, but for Defendants' breaches of duty, the Severstal Trust would have earned returns comparable to those of the Combined Trust during the period from November 3, 2008 through July 15, 2009.  Defendants have not overcome this presumption. Accordingly, the Court finds that Defendants are, jointly and severally, liable to Plaintiffs for the $9.6 million net differential between the actual performance of the Severstal Trust and the performance that could have been achieved during the relevant period had the Severstal Trust been invested in the same manner as the Combined Trust.

The Court finds that Plaintiffs have proven by a preponderance of the evidence that the Severstal Plans would have earned $9.6 million more than they did invested in the undiversified Neuberger Berman Account,[5] and that this loss is attributable to Defendants' breach of their fiduciary duties.  Defendants failed to structure the division of Combined Trust assets in a manner that was prudent under the circumstances and to manage the assets of the Severstal Trust in a manner consistent with their contractual and fiduciary duties.  Defendants failed to render investment advice consistent with their fiduciary duties, including but not limited to failing to inform the Severstal Retirement Committee of the need to diversify the transferred portfolio immediately, and to advise the Severstal Retirement Committee on an appropriate

---

[5]     This amount accounts for the transfer of approximately $6 million in cash and cash equivalents that was transferred from the WHX Pension Trust to Severstal in March 2009, as part of a final reconciliation of the amounts owed to Severstal, and other receipts and disbursements.  (See Trial Tr. (Berenblut) at 1479:4-6 and 1479:9-11.)

strategy for the account and the steps required to be taken to empower Plaintiffs to implement a proper investment strategy.

Disgorgement of Fees Paid Under Investment Management Agreement

In light of Defendants' near-total dereliction of their duties under the Severstal Investment Management Agreement, the Court finds that disgorgement of the $110,438 that they were paid in investment management fees in respect of the period from January to May 19, 2009, is necessary and appropriate to make the plans whole.  Defendants are jointly and severally liable for repayment of these fees.

Damages for Breach of Contract

As explained in the Court's April 2014 Memorandum Order, WPN is liable for the breach of its contractual obligation under the Severstal Investment Management Agreement to obtain and maintain fiduciary liability insurance.  The damages resulting from this breach are coextensive with the damages arising from WPN's breaches of fiduciary duty and its acceptance of investment management fees while breaching its fiduciary duties under the agreement.

Prejudgment Interest

ERISA "authoriz[es] the district court to award prejudgment interest to a successful ERISA claimant," Slupinski v. First Unum Life Ins. Co., 554 F.3d 38, 53-54 (2d Cir. 2009), and "a monetary award does *not* fully compensate for an injury unless it includes an interest component," id. (quoting Kansas v. Colorado, 533 U.S. 1, 10 (2001)) (internal quotation marks omitted) (emphasis in original).  Federal law does not specify a rate of interest to be used when awarding prejudgment interest.  New York law, which is specified as the law governing

the Severstal Investment Management Agreement to the extent not preempted by federal law,[6] provides for a prejudgment interest rate of nine percent.  N.Y. C.P.L.R. § 5004.  This rate is the product of a considered judgment on the part of the legislature as to what is necessary to compensate a plaintiff fully for loss, see Alfano v. CIGNA Life Ins. Co. of N.Y., 2009 WL 890626, at *7 (S.D.N.Y. April 2, 2009), and is particularly appropriate here, given the retirement income producing purpose of plan investments and the fact that, as demonstrated by the testimony of Berenblut, and by the diversified composition of the Combined Trust assets, prudent plan investment strategies combine high-earning equity and more stable fixed income investments in a diversified portfolio.  Plaintiffs are, accordingly, awarded prejudgment interest at the New York statutory rate of nine percent from July 16, 2009, to the date of judgment.

<u>C</u>ONCLUSION

For the foregoing reasons, the Court finds that Defendants breached their fiduciary duties to Plaintiffs and that the breaches caused the Severstal Plans to suffer a loss of $9.6 million.  Defendants are also liable for the disgorgement of the $110,438 in investment management fees paid to them during the relevant period.  Plaintiffs are awarded prejudgment interest at the New York statutory rate of nine percent.

The Clerk of the Court is directed to enter judgment in favor of the Plaintiff Plans and the individuals in their representative capacities against Defendants, jointly and severally, for damages and disgorgement in the total amount of $9,710,438, plus $5,305,889.74 as prejudgment interest for the period from July 16, 2009, to August 10, 2015, for a total judgment of $15,016,327.74 and to close the case.

---

[6]    (<u>See</u> Joint Ex. 1 at 7; Joint Ex. 4 at 5, 7.)

SO ORDERED.

Dated: New York, New York
      August 10, 2015

                                                                        /s/ Laura Taylor Swain
                                                                  LAURA TAYLOR SWAIN
                                                                  United States District Judge